**CANAL BARGE COMPANY, INC.**

v.

**CHINA OCEAN SHIPPING CO., etc.**

**Civ. A. No. 82–5614.**

United States District Court,
E.D. Louisiana.

Feb. 1, 1984.

Robert B. Acomb, Jr. and Robert T. Lemon, II, New Orleans, La., for plaintiff.

Francis Emmett and James A. Cobb, Jr., New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Algiers Point is located on the right descending bank of the Mississippi River. It is a turn in the river of somewhat more than ninety degrees. Practically speaking, ships passing each other at the Point cannot see each other before reaching it. A very strong current flows in the bend across from Algiers Point. It is particularly swift during high river conditions. Just below the Point, along the right descending bank, lies an eddy which reaches out into the river substantially. In this eddy, the water moves upstream. Along the opposite shore, in the bend, lies another eddy, also moving upstream. The acuteness of the turn, and swiftness in the bend, may cause difficulty to vessels in controlling their lateral movement.

2. M/V HUATONGHAI is a single-screw bulk cargo vessel of 36,232 metric tons, owned and operated by the China Ocean Shipping Company, Shanghai, People's Republic of China. At about 10:40 a.m., on the morning of December 7, 1982, Carl Scully (addressed on VHF channel 67 as "Unit 62"), a Crescent River Association pilot, boarded HUATONGHAI downriver from Algiers Point and took control as it proceeded upriver.

3. Contemporaneously, M/V ELAINE JONES, a twin-screw towboat or pushboat of 154 feet and 5,000 h.p., owned and operated by Canal Barge Company, Inc., was some distance upriver, in the New Orleans vicinity, proceeding downriver for Devant, Louisiana. ELAINE JONES had a tow of eight loaded coke barges, four abreast and two deep. The captain, Walter C. Patronas, was at the conn.

4. M/V DELTA TENN, a twin-screw pushboat or towboat, 140 feet long, 5,600 h.p., owned and operated by Valley Towing Service, Inc. of Memphis, Tennessee, was also proceeding downriver behind ELAINE JONES. DELTA TENN was pushing eight empty oil barges. Captain James Griffin was conning DELTA TENN, waiting for Pilot James Miller to relieve him at 11:30 a.m.

5. December 7, 1982, was a clear day with some winds, but not of significant strength. The river was measured at the 9.57 feet stage at the Carrollton Gauge, and 9.07 feet at the Harvey Lock Gauge. Although these measurements indicate relatively high water in the New Orleans area, the Algiers Point Traffic Light (operated at times by the U.S. Coast Guard

Vessel Traffic Service to control passing) was not in use.

6. At 10:55 a.m., DELTA TENN overtook ELAINE JONES at Gouldsborough Bend above the Greater New Orleans Bridge. DELTA TENN passed ELAINE JONES after agreeing, by radio, to a two-whistle passing.

7. At 11:10, Captain Patronas indicated ELAINE JONES' position at the Greater New Orleans Bridge. Griffin, a half mile ahead on board DELTA TENN, was communicating with BIG ED, a northbound tow. Agreeing to a one-whistle, or port-to-port passing, Griffin broadcast: "I'm probably going to have to eat that Point alive."

8. Patronas indicated that he was following DELTA TENN, and also requested a one-whistle passing, to which BIG ED agreed.

9. Scully came on the air just after the above conversations, and said "Unit 62 northbound, Todd Shipyard." HUATONGHAI was just below the Industrial Canal, making 13 m.p.h. at full ahead, maneuvering speed. After reaching the General Anchorage, Scully began to favor the right descending bank from his position in midriver.

10. Scully first became aware of ELAINE JONES and DELTA TENN when HUATONGHAI came abeam of the Industrial Canal. At 11:15, he called for DELTA TENN.

11. Griffin was communicating with BIG ED, who mentioned that "a ship," meaning HUATONGHAI, was moving upriver below the Point.

12. At 11:18, Scully made two successive broadcasts calling for responses from southbound traffic above Algiers Point.

13. Patronas responded that ELAINE JONES was approaching, and added his observation that DELTA TENN was at the Point.

14. Scully asked Griffin his intentions regarding the passing at Algiers Point. DELTA TENN was encountering difficulty maneuvering around SCOTT S, a tow which apparently had not communicated.

Griffin responded to Scully that SCOTT S was in his way. He then carried out a two-whistle passing by shoving left across the bow of SCOTT S, then steering right, across its stern, toward the Point.

15. At 11:19, Scully asked if he should expect a two-whistle passing with DELTA TENN. Griffin responded that he hoped not. Scully replied: "Oh, Christ, where am I going to put my ship?" Patronas entered the conversation, stating: "In reverse." Scully replied: "Yeah, right. Make it a national monument."

16. At 11:21, Scully again called DELTA TENN, requesting its location. Griffin responded that DELTA TENN had reached Algiers Point Scully asked what would be the best way of meeting. Griffin said he could manage a two-whistle passing if HUATONGHAI stayed below the Point. He added that ELAINE JONES was close behind.

17. Scully indicated that although HUATONGHAI's engines were stopped, the vessel was still moving slowly upriver, apparently still carrying a forward momentum. Very soon thereafter, HUATONGHAI got under way—full ahead. She proceeded at full ahead from that time onward.

18. Scully stated that he was in the middle of the river because he didn't know which side to get on.

19. Patronas stated that he was abeam of Orgulf Fleet (quite near Algiers Point) with a tow four barges wide and two long, and inquired of Scully how DELTA TENN and HUATONGHAI planned to pass.

20. Scully replied that Griffin had not yet told him, and called for DELTA TENN.

21. Griffin stated, "I told you I'm coming around the Point there." He repeated that as long as HUATONGHAI was below the point, a two-whistle passing was feasible.

22. Following this conversation, at approximately 11:23, DELTA TENN and HUATONGHAI came into each other's view. DELTA TENN and HUATONGHAI were about half a mile apart. HUATON-

GHAI was close to midriver, and apparently making some considerable speed upstream (in spite of the current) rather than drifting as Scully had just previously indicated.

23. Griffin said he could not meet on two whistles; thereupon, Scully asked for clarification; Griffin replied that Scully must move left if he wanted a starboard-to-starboard passing. In that context, DELTA TENN made the two-whistle passing, experiencing considerable difficulty in maintaining lateral control and avoiding the left descending bank.

24. Patronas did not see the meeting of the two vessels, but did see DELTA TENN maneuvering leftward as it passed out of sight, moving off the Point and out into the mainstream.

25. At 11:24, Scully called ELAINE JONES. When Patronas responded, Scully asked how he proposed to pass.

26. Patronas asked how DELTA TENN had passed HUATONGHAI. Scully replied that they were passing starboard to starboard, but that he could not make a two-whistle passing of ELAINE JONES if Patronas cut the Point so close.

27. Patronas apparently understood Scully to mean that a two-whistle passing was impossible, and proposed a one-whistle meeting. Scully replied that he was approaching the Point, that he had just changed course to pass DELTA TENN, and asked Patronas to "widen out" to make a starboard-to-starboard passing.

28. Patronas' answer was not clear. He said he had slowed to a drift, and was letting his tow float out into the bend. Scully replied that he, too, had slowed to a drift, but that he was still creeping up on the Point.

29. Essentially, at this point in time (and location), the two vessels were not quite in sight of each other, but just about to come into each other's view.

30. ELAINE JONES had just reached the bend when Patronas saw HUATONGHAI, which was considerably closer to midriver and further upstream than he had

supposed would be the case from the transmissions above referred to.

31. HUATONGHAI was moving at considerable speed. A collision, however, did not appear imminent, for ELAINE JONES had, by then, been obliged to go left and thus had gotten into the swift bending current and was being taken away from the Point.

32. ELAINE JONES began to slide laterally as the two vessels passed each other some 350 feet apart. Patronas tried unsuccessfully to "drive" out of the slide, with engines full ahead, and rudders moving back and forth from midships to hard astarboard.

33. ELAINE JONES and its tow collided with the Esplanade Avenue Wharf at about 11:30 a.m. The stern of ELAINE JONES collided with RECONQUISTA anchored at the wharf, then the barges forming the left side of the tow swung leftward and struck NELSON, also anchored at the wharf. At some indeterminate point, ELAINE JONES struck the wharf itself.

### Conclusions of Law

1. This court has jurisdiction over this maritime proceeding and venue is properly in the Eastern District of Louisiana. 28 U.S.C. § 1333.

2. This court must ascertain which acts or omissions contributed to the landing of ELAINE JONES and apportion damages accordingly. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

3. Under the "Point-Bend Custom" governing the meeting of vessels at turns in the Mississippi River, traffic proceeding upstream hugs the point, and traffic proceeding downstream follows the bend. The practice allows descending vessels to take advantage of, and ascending vessels to avoid, the swift currents common along a bend. The "Point-Bend Custom" is not a rule of law. Conditions at Algiers Point are not particularly amenable to the "Point-Bend Custom." Indeed, it has been suggested that the actual passage

of sizeable vessels in high water is only safe below or above the Point. Failure to follow the "Point-Bend Custom" does not, in sum, invoke the "PENNSYLVANIA Rule" requiring a presumption of negligence. *See, The PENNSYLVANIA,* 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874).

4. At the time ELAINE JONES and HUATONGHAI came into mutual view, the actions putting ELAINE JONES in danger had been, for all practical purposes, accomplished. Patronas' maneuvers obviated the possibility of collision, and his failure to sound a danger signal has no bearing.

5. Scully failed to reverse engines or, at least, to slow down when the prospect of embarrassing the navigation of ELAINE JONES was apparent.

6. The "agreement"[1] to pass on two whistles committed Patronas to widen out into the bend at the last minute, without having properly lined up beforehand. This "agreement"[1] resulted from negligence on the part of both approaching vessels.

7. The Inland Navigation Rules apply to vessels on the Mississippi River. *E.g., Transorient Navigators Company, S.A. v. M/S SOUTHWIND,* 714 F.2d 1358 (5th Cir.1983). *Allied Chemical Corporation v. Hess Tankship Company of Delaware,* 661 F.2d 1044 (5th Cir.1981).

8. Inland Navigation Rule 9(a)(ii), 33 U.S.C. § 2009(a)(ii) provides:

> ... a power-driven vessel operating in narrow channels or fairways on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right of way over an upbound vessel, shall propose the manner and place of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i) as appropriate. The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

9. Patronas did not make clear, affirmative signals of his intended management of clearing the Point at an early enough time. Although he signaled a general intention to hug the Point, no affirmative assertion that a one-whistle passing was preferred was specifically signaled.

10. Even so, it is clear that Scully essentially took over the so-called agreement process with the result that when he insisted on a two-whistle passing while still moving upriver at considerable speed (and on past the Point), his actions precluded any free exercise of Patronas' prerogative. Indeed, Scully failed to reverse engines or slow down at a time when he could safely have waited for the downcoming vessels to pass. This would have been far more appropriate, safer, and much less likely to endanger ELAINE JONES and her tow.

11. HUATONGHAI placed itself in a position which forced an unacceptable two-whistle passing with ELAINE JONES, in a configuration that left little doubt that ELAINE JONES would be swept left and into the dock area.

12. HUATONGHAI was two-thirds at fault, and ELAINE JONES one-third. Damages resulting from the collision at the Esplanade Avenue Wharf shall be apportioned accordingly.

Counsel for plaintiff will submit a judgment consistent with these findings.

---

**1.** By use of this term, I mean only to indicate that there was, prior to the actual passing, an understanding that it would be a two-whistle, or starboard-to-starboard, maneuver. However, I have placed the term in quotation marks because I conclude that the so-called agreement was not freely arrived at but was forced by circumstances more fully described in my findings of fact.