William G. BRIDGES, Plaintiff,

v.

PENROD DRILLING COMPANY,
Defendant/Third Party
Plaintiff-Appellee,

v.

OFFSHORE LOGISTICS SERVICES,
INC., Defendant/Third Party
Appellant.

No. 84–3004
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 4, 1984.

Phelps, Dunbar, Marks, Claverie & Sims, Clayton G. Ramsey, Bettye A. Barrios, New Orleans, La., for defendant/third party appellant.

Lawrence E. Abbott, Steven K. Best, New Orleans, La., for defendant/third party plaintiff-appellee.

Before REAVLEY, POLITZ and HIGGINBOTHAM, Circuit Judges.

POLITZ, Circuit Judge:

This appeal poses the question whether a roustabout/seaman on a submersible drilling rig, protected by the full panoply of traditional seaman's remedies for injury, falls into one of "the pockets of *Sieracki* seamen remaining after the 1972 amendments" to the Longshoremen's and Harbor Workers' Compensation Act, *Aparicio v. Swan Lake*, 643 F.2d 1109, 1118 n. 17 (5th Cir.1981), while briefly engaged in transferring equipment from a supply vessel to the rig. Under the facts of this case, we conclude that the roustabout did not become a *Sieracki* seaman. Further, finding no reversible error in the district court's allocation of fault, we affirm.

### Facts and Procedural Background

William G. Bridges was injured on December 9, 1977 while employed by Penrod Drilling Company as a roustabout assigned to its submersible drilling rig, the PENROD 72, located in the Gulf of Mexico approximately 200 miles off the coast of Louisiana. The parties agree that Bridges was a seaman and that the PENROD 72 was a vessel. The parties also agree that Bridges was not subject to the provisions of the LHWCA, 33 U.S.C. §§ 901–50, because at the time of his injury the LHWCA did not cover the PENROD 72. It was not until the subsequent 1978 amendments to the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–56, that coverage of the LHWCA was extended to rigs such as the semi-submersible PENROD 72.

On December 8, 1977 the M/V THOMAS DRAYTON, owned by Offshore Logistics Services, Inc. and operated by Offshore Logistics, Inc. (collectively "Offshore"), manned by a crew of six, departed Intracoastal City, Louisiana with a load of drilling mud, water, and miscellaneous cargo for the PENROD 72. The cargo included a score of 55 gallon drums stowed on the very stern of the ship, lashed with a chain binder. The voyage out was uneventful and the THOMAS DRAYTON reached the

PENROD 72 around 7:00 a.m. when seas were running to 12 feet and the wind was out of the southeast at up to 35 knots. The captain of the THOMAS DRAYTON determined to remain at anchor and defer transferring the cargo until conditions improved. Around 8:00 a.m. on December 9, 1977, during a lull in the weather, the ship was moored to the rig stern first. The supply vessel began pumping drilling mud and water up to the rig.

Shortly after the vessel moored the winds changed to the northeast, reaching a velocity variously estimated between 40 and 60 knots with seas estimated as running between 10 and 15 feet. Waves were breaking over the side of the vessel. Several drums at some point had escaped their lashing and were rolling free on the stern. The captain and crew of the THOMAS DRAYTON acted as if unaware of the unseaworthy conditions caused by the washing back and forth of the cargo.

Operations on the rig were halted for lack of a casing hanger which was aboard the vessel. Despite the severe weather, the rig's supervisory personnel were intent on resuming drilling. Bridges and a second equally inexperienced roustabout were ordered aboard the vessel to unload the casing hanger. A more experienced roustabout first refused to allow the crane operator to lower him in a personnel basket to the stern of the ship for that purpose because of the high seas and the free-rolling drums. Notwithstanding this apparent danger, Bridges was ordered to descend to the deck of the THOMAS DRAYTON. He followed the orders of his superiors and was injured moments after reaching the deck when one of the runaway drums crushed him against a piece of heavy equipment.

Bridges sued Penrod invoking the Jones Act, 46 U.S.C. § 688. He also sued Penrod and Offshore under general maritime law. Penrod and Offshore claimed indemnity from each other and Penrod alternatively claimed contribution. Bridges' claims were settled for $330,000, with contributions of $270,000 from Penrod and $60,000 from Offshore. The issues of indemnity and contribution were presented to the district court on the basis of depositions and other documentary evidence. After briefs and oral argument the district court rejected all claims of indemnity and apportioned liability ⅔ to Penrod and ⅓ to Offshore, entering judgment accordingly. Offshore appeals, assigning error in the district court's rejection of its claim for indemnity and, alternatively, challenging the trial court's apportionment of responsibility.

## Analysis

Offshore's principal contention is that the district court erred in denying its claim for indemnity. This claim is based on the theory that Penrod breached the stevedore's implied warranty of workmanlike performance when it caused Bridges to attempt to unload the THOMAS DRAYTON in the face of known dangerous conditions. Offshore contends that it was only through these actions of Penrod that the preexisting unseaworthy conditions of its vessel were brought into play. Offshore's claim presumes the applicability of the teachings of *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) (affording a longshoreman seaman status and a cause of action against the vessel for breach of the warranty of seaworthiness), and *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (allowing a vessel an action in indemnity against the stevedore for breach of the warranty of workmanlike performance).

In *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir.1981), and *Burks v. American River Transportation Co.*, 679 F.2d 69 (5th Cir.1982), we discussed at length *Sieracki* and *Ryan*, and their progeny, and the impact of the 1972 amendments to the LHWCA which were designed to abrogate *Sieracki/Ryan* in situations covered by the LHWCA. In *Aparicio* we concluded that maritime workers covered by the Federal Employees Compensation Act, 5 U.S.C. §§ 8101–93, who were not subject to LHWCA, were not barred by the 1972

amendments from asserting claims as *Sieracki* seamen and that the *Ryan* indemnity rights followed. In dicta we noted that privately employed longshoremen and harbor workers injured outside of the territorial coverage of LHWCA might be considered *Sieracki* seamen despite the 1972 amendments. In *Cormier v. Oceanic Contractors, Inc.*, 696 F.2d 1112 (5th Cir.1983), we applied the *Aparicio* rule to a welder injured while working aboard a vessel in Dubai, United Arab Emirates. The welder was not a Jones Act seamen, he was a harbor worker employed outside the geographical reach of the LHWCA. Adhering to *Aparicio*, we found the welder to be a *Sieracki* seaman.

The district court's findings and conclusions are not inconsistent with *Aparicio/Burks/Cormier*. Those cases and the lodestar *Sieracki* were concerned with extending the rights accorded seamen to longshoremen who were injured while doing traditional seaman duties. But such is not the situation now before us. The issue presented on this appeal is *not* "whether landlubbers who do sailor's work aboard ships were dislodged from their *Sieracki* seaman status by the wake of the 1972 amendments" to the LHWCA, *Aparicio*, 643 F.2d at 1110, but whether a seaman whose duties include doing the unloading work of a longshoreman, in a setting not subject to the LHWCA, by some act of legal legerdemain leaves his regular seaman status and joins a "pocket of *Sieracki* seamen." We are persuaded that no such transformation occurs. None need occur.

As a member of the crew of the special purpose vessel PENROD 72, Bridges was possessed of the full range of traditional seaman's rights and remedies: maintenance and cure and a Jones Act negligence claim against his employer as employer, an unseaworthiness, strict liability claim against his employer as vessel owner for any injury on the PENROD 72, and a negligence claim in maritime tort for Offshore's breach of the duty of reasonable care under the circumstances. In order to achieve adequate protection it was not necessary that Bridges be characterized as a remnant *Sieracki* seaman of the THOMAS DRAYTON. It cannot be said that Bridges was either "covered by no compensation act or by a compensation scheme that is far more stringent in its benefits than is the LHWCA." *Aparicio*, 643 F.2d at 1118 n. 17. The district court correctly rejected Offshore's indemnity claim against Penrod for purportedly breaching its duties as stevedore. One with seaman status does not become additionally a *Sieracki* seaman by doing stevedoring work which might be styled traditional seaman's duties.

■ Finally, we find no reversible error in the district court's apportionment of fault. Our review of this allocation is governed by the clearly erroneous standard of Fed.R.Civ.P. 52(a). *Inland Oil and Transport Co. v. Ark-White Towing Co.*, 696 F.2d 321 (5th Cir.1983); *Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044 (5th Cir.1981). The trial court's ⅔—⅓ division of fault finds ample support in the record. Penrod was obviously at fault for dispatching Bridges to the deck of the THOMAS DRAYTON under the then extant severe weather conditions, particularly in light of the fact that the loose drums could be seen for the looking and were seen by members of the PENROD 72 crew. The master and crew of the THOMAS DRAYTON were likewise negligent. The drums had broken free of their lashing and posed obvious dangers to all near them. The captain maintains that he was unaware of the loose drums, that he could not see the stern from the wheelhouse because cargo blocked his view. The vessel was tied to the PENROD 72 by the stern. One or more members of the crew went to the stern to work the mooring lines. They either did not see what was there to be seen or did not report that which they saw. Further, the captain remained moored after the wind changed direction and reached a velocity, with accompanying seas, greater than that which existed the day before when he declined for safety reasons to tie up. The trial court's

findings, while subject to arguable challenge, are not clearly erroneous.

AFFIRMED.