**CANAL BARGE COMPANY, INC.,**
**Plaintiff-Appellee,**

v.

**CHINA OCEAN SHIPPING CO., etc.,**
**Defendant-Appellant.**

**WATERMAN STEAMSHIP CORP.,**
**Plaintiff-Appellee,**

v.

**M/V ELAINE JONES, etc., et al., Defendant.**

**CANAL BARGE COMPANY, INC.,**
**Defendant-Third Party**
**Plaintiff-Appellee,**

v.

**CHINA OCEAN SHIPPING CO., Third Party Defendant-Appellant.**

Nos. 84–3211, 84–3847.

United States Court of Appeals,
Fifth Circuit.

Sept. 16, 1985.

Emmett, Cobb, Waits & Kessenich, James A. Cobb, Jr., Francis Emmett, New Orleans, La., for China Ocean Shipping Co.

Joseph W. Nelkin, Baltimore, Md., for amicus curiae Crescent River Port Pilots.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert T. Lemon, II, New Orleans, La., for Canal Barge Co.

Edward F. Lebreton, III, T. Gregory Serwich, II, New Orleans, La., for Waterman S.S. Corp.

Before RUBIN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Algiers Point, at which the Mississippi River, flowing past New Orleans, makes a deep bend, is fabled in history, beautiful in aspect, and a peril to navigators. This fact-bound appeal involves another of the frequent collisions and allisions that result from the sharpness of the bend, the vagaries of the river current, and the failure of pilots to take sufficient precautions. Because the finding of the district court, that the collision for which damages are here sought was caused by the mutual fault of the vessels involved, is supported by the record, we affirm.

Algiers Point juts out from the right descending bank of the Mississippi River at New Orleans opposite the Vieux Carre causing the river to turn more than ninety degrees. A strong southerly current flows in the bend across from the point. An eddy, or countercurrent, in which water flows upstream, creates an additional hazard just below the point, on the right descending bank of the river. The elevation of Algiers Point prevents vessels on either side from seeing one another.

The river was relatively high in the winter of 1982. Although the river current is usually somewhat less than three knots, the high water created a current of approximately five knots in the bend. During high water, determined by the Carrolton river gauge at New Orleans,[1] navigation in this section of the river is so hazardous

---

1. 33 C.F.R. § 161.402(b)(1) (1984).

that the U.S. Coast Guard Vessel Traffic Service operates navigation lights [2] to control passing at the point. These lights warn north and southbound vessels not to pass. In violation of the Coast Guard's own regulations, however, the lights were not operating on December seventh, the date of the collision. Pilots, therefore, proceeded to pass at the point and, to do so, made their own passing arrangements.

At approximately 10:45 a.m., the M/V ELAINE JONES, with a tow of eight loaded coke barges, was in the vicinity of New Orleans proceeding south to Devant, Louisiana. The towboat M/V DELTA TENN was immediately behind the ELAINE JONES, pushing eight empty barges. The DELTA TENN overtook the ELAINE JONES without incident above the Greater New Orleans Bridge. Thereafter, the ELAINE JONES continued to follow the DELTA TENN approximately one-half mile astern.

At the same time, the M/V HUATONGHAI was proceeding north below Algiers Point. Carl Scully, a Crescent River Association pilot, was at the conn, that is, in charge.

Because the radio communications among the various vessels were recorded, the conversations can be reported without the distortion of witnesses' recollections of who said what and when. At 11:10 a.m. the DELTA TENN used radio to arrange a port-to-port passing immediately above Algiers Point with a northbound tow, the BIG ED. In the process of negotiating this passing arrangement, the DELTA TENN twice broadcast her intention to hug the point. The ELAINE JONES then also negotiated a port-to-port passing with the BIG ED by radio.

The HUATONGHAI, still northbound below Algiers Point, requested that southbound traffic advise her of their presence. The ELAINE JONES responded that she was coming to the bridge and that "DELTA TENN is on the point," whereupon pilot Scully asked the DELTA TENN her inten-

tions. DELTA TENN replied: "I'm trying to get on the point." Scully then asked the DELTA TENN if he should expect a starboard-to-starboard, or two-whistle, passing. The transcript of their radio conversation reads:

> DELTA TENN: "Uh, I hope not. I'm going to have to point [unintelligible] that point's a little bit."
>
> [Scully]: "Oh Christ, where am I going to put my ship?"
>
> ELAINE JONES: "In reverse."
>
> [Scully]: "Yeah, right. Make it a national monument."

A few minutes later, at 11:21 a.m., Scully radioed the DELTA TENN and asked her position and the best way of passing. The DELTA TENN responded that she was on the point and: "If you *stay up below the point* there a little ways, I can see you on two [presumably meaning a two-whistle, or starboard-to-starboard passing]. But other than that, ELAINE JONES is also right behind me here and he is wanting the point at that point a little bit." (Emphasis added.) Scully replied that the HUATONGHAI was stopped, but that she was still creeping towards the point. Shortly thereafter, at 11:23 a.m., the HUATONGHAI returned to Full Ahead and, except for a one-minute period when she traveled at Dead Slow Ahead, she retained her speed for the duration of the passing.

By this time the HUATONGHAI was in the middle of the river presumably because Scully, as the transcript reveals, did not know which way to go. The DELTA TENN then repeated that, if the HUATONGHAI would hold up below the point, a starboard-to-starboard passing would be feasible. At 11:23 a.m., the DELTA TENN and the HUATONGHAI reached places from which the crew of each could see the other; they were then about one-half mile apart. The DELTA TENN immediately requested that the vessels change to a port-to-port, or one-whistle, passing. Scully asked for clarification. The DELTA TENN replied that, if Scully wanted a starboard-to-starboard passing, the HUATONGHAI

---

**2.** *Id.* at § 161.402(b)(1–3).

would have to move over toward the right descending bank. The DELTA TENN and the HUATONGHAI agreed to the two-whistle passing. Apparently, however, the DELTA TENN experienced considerable difficulty in completing the passing. The captain of the DELTA TENN testified that he was able to avoid an allision like the one experienced a moment later by the ELAINE JONES only because his tow consisted of empty barges, making it light enough for his engines to control.

The crew of the ELAINE JONES and the HUATONGHAI still could not see each other. Scully radioed the ELAINE JONES and asked what kind of passing she preferred. Scully stated that he was "not going to meet [the ELAINE JONES] on the two-whistle if [the ELAINE JONES was] going to cut the point that close." The ELAINE JONES responded that a port-to-port passing was fine. Scully replied that a one-whistle passing was not possible because the HUATONGHAI was now near the right descending shore. He requested that the ELAINE JONES "widen out" for a two-whistle passing. The response of the ELAINE JONES is unclear, but she did request the HUATONGHAI to "cool off," that is, slow down, and give the ELAINE JONES some time. The two-whistle passing was then confirmed.

To execute the agreed starboard-to-starboard passing, the ELAINE JONES was forced to alter course to port and get into the swift current. The two vessels then came in view of one another. The HUATONGHAI was making "considerable speed." The vessels passed at the point well clear of each other because the swift current had swept the ELAINE JONES laterally towards the bank across from the point. At approximately 11:30 a.m., the ELAINE JONES collided with the Espla-nade Avenue Wharf and two vessels moored there, the RECONQUISTA and the THOMAS NELSON.

The owner of the ELAINE JONES and her tow sued the owner of the HUATONGHAI for damages sustained by two of the barges that the ELAINE JONES had in tow at the time of the collision, alleging that the negligent navigation of the HUATONGHAI had embarrassed the navigation[3] of the ELAINE JONES and caused the collision. Waterman Steamship Corporation, the owner of one of the moored ships damaged in the collision, also sued the ELAINE JONES and the HUATONGHAI. The district court found the ELAINE JONES to have been one-third at fault in causing the collision and the HUATONGHAI two-thirds at fault.[4] In accordance with *United States v. Reliable Transfer Company*,[5] the court apportioned liability in like proportions, and, invoking collateral estoppel, reached the same result in the *Waterman Steamship* case.[6] The two cases are consolidated on appeal.

The district court found the ELAINE JONES negligent in failing to (1) make clear her desire to hug the point and (2) assert affirmatively her preference for a port-to-port passing with the HUATONGHAI. These findings are not contested by either party.

The district court found the HUATONGHAI negligent in several respects. First, the HUATONGHAI failed to reverse or slow down its engines "when the prospect of embarrassing the navigation of ELAINE JONES was apparent."[7] Second, the HUATONGHAI was negligent in "forcing" a starboard-to-starboard passing arrangement when it knew, or should have known, of the ELAINE JONES' need and desire to

---

**3.** Embarrassments of navigation occur when a pilot is unable to control his vessel in strong currents while navigating around points. Lugenbuhl & Maki, *River Navigation*, 51 Tul.L.Rev. 1157, 1176–77 (1977).

**4.** *Canal Barge Co. v. China Ocean Shipping Co.*, 579 F.Supp. 243, 247 (E.D.La.1984).

**5.** 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

**6.** *Waterman S.S. Corp. v. M/V ELAINE JONES, Etc., Et Al.*, No. 83–5019 (E.D.La. Nov. 15, 1984) (order granting summary judgment).

**7.** *Canal Barge Co.*, 579 F.Supp. at 247.

hug Algiers Point.[8] Finally, the court found the HUATONGHAI imprudent in failing to hold up or slow down to permit the ELAINE JONES to clear the point prior to the passing.[9]

Questions of negligence in admiralty cases tried to the court are treated as fact questions reviewable under the clearly erroneous standard of Fed.R.Civ.P. 52(a).[10] The record contains ample evidence to support the district court's conclusion that Scully was, or should have been, aware of the ELAINE JONES' need to hug the point. There was also testimony that, during times of high water, the custom at Algiers Point is for the northbound vessel to slow or stop until the southbound vessel clears the point. We hold that the district court's judgment that the HUATONGHAI was negligent finds support in the evidence, and is, therefore, not clearly erroneous.

The owner of the HUATONGHAI argues that the court erred in not allocating a greater degree of fault to the ELAINE JONES, basing its argument on the district court's treatment of the point-bend custom. Because the starboard-to-starboard passing was in compliance with the point-bend custom, it contends, the court's assessment of fault to the HUATONGHAI was excessive.

The point-bend custom has long governed the meeting of vessels on the lower Mississippi River. According to this custom, the northbound vessel navigates upriver by going "over the points," that is, by navigating close to the points, while the southbound vessel "runs the bends," that is, adheres as closely to the bends as safe navigation allows. This practice permits traffic proceeding upriver to avoid the strong current by taking advantage of the slack water beneath the point and allows the less maneuverable traffic proceeding downriver to run with the current into the bends.

We have frequently applied the point-bend custom[11] saying that it is "judicially recognized ..."[12] and "of such long standing that it has the force of law...."[13] However, we have never stated that the applicability of the custom is a rule of law. Apparently, the trial court was not asked to take judicial notice of the point-bend custom, as it might have done despite testimony that some of the individuals involved were unaware of the custom, and as we have done in the past.[14] Analysis of our prior opinions dealing with the point-bend custom reveals that it may have the "force of law," but only after the litigants have established its applicability under the facts of that case. The district court was correct, therefore, in its observation that "[t]he 'point-bend custom' is not a rule of law,"[15] insofar as recognizing it as such a rule would make it invariably applicable.

Instead, following the testimony that the custom was not observed at Algiers Point when the river was high, the trial court properly handled the application of the point-bend custom in this case as a question of fact. Even when the custom prevails, pilots of approaching vessels may agree to pass in some fashion other than the manner provided by habitual practice.[16] In this case, the parties did not rely on the custom, but instead undertook to establish their

---

8. *Id.*

9. *Id.*

10. *Castorina v. Lykes Bros. S.S. Co.,* 758 F.2d 1025, 1034 (5th Cir.1985); *Transorient Navigators Co., S.A. v. M/S SOUTHWIND,* 714 F.2d 1358, 1364 (5th Cir.1983); *Cheek v. Williams-McWilliams Co., Inc.,* 697 F.2d 649, 652 (5th Cir.1983).

11. *Valley Towing Service, Inc. v. S/S AMERICAN WHEAT,* 618 F.2d 341 (5th Cir.1980); *Bd. of Comm'rs of the Port of New Orleans v. M/V*

FARMSUM, 574 F.2d 289 (5th Cir.1978) (see cases cited therein); *The NORNE,* 59 F.2d 145 (5th Cir.1932).

12. *Valley Towing Service,* 618 F.2d at 342 n. 1.

13. *The NORNE,* 59 F.2d at 147.

14. *Vlastos v. Koch-Ellis Marine Contractors, Inc.,* 302 F.2d 462 (5th Cir.1962).

15. *Canal Barge,* 579 F.Supp. at 246.

16. *M/V FARMSUM,* 574 F.2d at 295, 297.

own arrangement and, as a result of mutual fault, did not do so sufficiently in advance and with sufficient care to avert the accident.

As a second basis for its attack on the apportionment of liability, the owner of the HUATONGHAI argues that the lower court improperly applied the Narrow Channel Rule [17] to Algiers Point. Although the Inland Navigational Rules [18] apply generally to vessels on the Mississippi River,[19] Rule 9 [20] is much more limited in scope. It governs passing situations only in narrow channels. The rule, however, does not define "narrow channel" or list the bodies of water to which it applies. Accordingly, application of the rule has been left to the courts.

The Inland Navigational Rules are of recent vintage; they became effective in late 1981. Because of their relatively recent promulgation, no court has yet interpreted the applicability of Rule 9. The new rules, however, incorporate in part the old Inland Rules.[21] Rule 9, for example, was partially formed from repealed Inland Rule 25,[22] known during its existence as the "narrow channel rule." Many cases have addressed the applicability of old Rule 25. They have said that the determination of what is a "narrow channel" is a mixed question of law and fact.[23] The application of the rule is not based solely on the physical dimensions of the water, but also on the character of navigational use.[24]

The Mississippi River at Algiers Point is over 1,600 feet wide. Although the district court's opinion is not explicit, the court implied that the Narrow Channel Rule, 33 U.S.C. § 2009, applied to the section of river at Algiers Point. Because our resolution of this case does not require us to decide the applicability of Rule 9 to this stretch of water, we express no opinion at this time.

The district court's apportionment of fault may not be disturbed unless it is clearly erroneous.[25] Although we might have assessed liability differently, the trial court's ⅔–⅓ division of fault finds ample support in the record.

For the reasons set out above, the judgment of the district court is AFFIRMED.

---

**17.** 33 U.S.C.A. § 2009(a) (West Supp.1985) (also called Rule 9 of the Inland Navigational Rules). That section provides:
(i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.
(ii) Notwithstanding paragraph (a)(1) ..., a power-driven vessel operating in narrow channels or fairways ... and proceeding downbound with a following current shall have the right-of-way over an upbound vessel [and] shall propose the manner and place of passage.... The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

**18.** 33 U.S.C.A. §§ 2001–2073 (West Supp.1985).

**19.** *See, e.g., Transorient Navigators Co., S.A. v. M/S SOUTHWIND,* 714 F.2d 1358 (5th Cir.1983).

**20.** 33 U.S.C.A. § 2009 (West Supp.1985).

**21.** 33 U.S.C. §§ 151–232 (repealed 1980).

**22.** *Id.* at § 210 (repealed 1980).

**23.** *Tempest v. United States,* 277 F.Supp. 59 (E.D.Va.1967), *aff'd,* 404 F.2d 870 (4th Cir.1968).

**24.** *Weathers Towing Inc. v. M/V HERMAN POTT,* 570 F.2d 1294, 1295 (5th Cir.1978).

**25.** *Bridges v. Penrod Drilling Co.,* 740 F.2d 361, 364 (5th Cir.1984); *Inland Oil and Transport Co. v. Ark-White Towing Co.,* 696 F.2d 321, 326 (5th Cir.1983); *Allied Chemical Corp. v. Hess Tankship Co. of Del.,* 661 F.2d 1044, 1057 (5th Cir.1981).