**ARCHER DANIELS MIDLAND COMPANY, et al.**

v.

**M/V FREEPORT, etc., et al.**

**Nos. 87–5950, 88–2020, 88–2488, 88–3156 and 88–3411.**

United States District Court, E.D. Louisiana.

Dec. 30, 1988.

Order Amending Fact Findings March 13, 1989.

Charles E. Lugenbuhl, Lugenbuhl, Burke, Wheaton, Peck & Rankin, New Orleans, La., for limitation petitioners.

Hugh Ramsey Straub, Trial Atty., Terriberry, Carroll & Yancey, New Orleans, La., for defendants in limitation.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court for nonjury trial. Having considered the evidence, the parties' memoranda and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

On December 12, 1987, 2335 hours, at Mile 117 AHP in the Mississippi River above New Orleans, the upbound laden freighter FREEPORT collided with the downbound tow of the tug M/V VICKI LYNNE. The FREEPORT subsequently

came into allision with a dock and moored barge.

Several lawsuits ensued, including a complaint filed by the owner and operator of the VICKI LYNNE seeking exoneration from and/or limitation of liability. All actions were consolidated for trial, and this Court received evidence bearing upon the liability for the collision and the demand for limitation. The issue of the amount of damages caused by the collision and allision was reserved for later determination.

The FREEPORT is a Cypriot flag car/bulk carrier with dimensions of 718 feet in length and 100 feet in breadth with tonnages of 29,715 gross, 22,597 net and 52,724 deadweight. Of conventional design, it has seven hatches forward and accommodation aft. The FREEPORT is powered by a diesel engine developing 13,100 horsepower, acting through a single screw. It is owned by defendant Sealink Shipping Co.

The M/V VICKI LYNNE is a typical river push boat, twin screw. It was built in 1969 and has dimensions of length, 56 feet; breadth, 24 feet; depth, 7.6 feet, documented with the U.S. Coast Guard for coastwise navigation. The vessel was repowered from 1,000 to 740 horsepower in summer 1987. At all relevant times, it was owned by defendant St. Charles Towing Service, Inc., and chartered to and working exclusively for CGB Marine Services[1] at La-Place. Its hull underwriters and protection and indemnity underwriters were Employers Insurance of Wausau, and its excess underwriters on both hull and protection and indemnity coverage were those underwriters subscribing to Price Forbes' Cover Notes AVM–4000 and AVM–4100.[2]

On the evening of December 12, 1987, the FREEPORT was north bound heading up river in the Mississippi River, laden with bulk ore cargoes to drafts of 32 feet 01 inch forward and 33 feet and 03 inches aft. The down bound VICKI LYNNE was pushing ahead a tow comprised of ten barges, made up of five barges wide and two barges long. The barges were each 35 feet wide and 195 feet long. The tow had an aggregate length of 390 feet and an aggregate width of 175 feet. The two starboard tiers in the tow were composed of four empty barges while the center and two port tiers were composed of six loaded barges[3]:

1. The claims against the CGB interests were settled prior to trial.

2. At all pertinent times, there was in full force and effect a protection and indemnity policy of insurance (No. EWL 1139) and a policy of insurance covering hull and machinery (No. EWH 10059), issued by Employers Insurance of Wausau, insuring against liabilities in respect of the VICKI LYNNE. At all material times, there was in full force and effect excess insurance through Price Forbes Limited, providing the VICKI LYNNE with first layer excess insurance coverage of $750,000, above the primary layer of $250,000, and second layer excess insurance coverage of $4,000,000 above primary and first layer excess of $1,000,000.

3. See FREEPORT Exhibits 33 and 34.

| DM-3016 empty | DM-2571 empty | |
|---|---|---|
| DM-1848 empty | DM-1851 empty | |
| HHP-2 loaded | SER-189 loaded | |
| CGB-119 loaded | V-2-B loaded | M/V VICKI LYNNE |
| MTI-186 loaded | RW-805 loaded | |

The VICKI LYNNE's crew had made up its tow at the CGB Marine Barge Fleet facility, pursuant to "night orders" prepared by CGB,[4] instructing the tug operator to locate six loaded and four empty barges in the barge fleet and construct a tow for the VICKI LYNNE to bring down river. The six loaded barges were bound for the Continental Grain Terminal at Westwego, mile 103 AHP, and the four empty barges were bound for the Public Bulk Terminal on the New Orleans Inner–Harbor Navigation Canal. The Master, Captain Phillip Rose,[5] came on duty at 1200 hours on December 12, and as was customary, the VICKI LYNNE's crew was working a 24 hour rotation, with a single licensed operator and its unlicensed deckhand working without relief for 24 hours. St. Charles, Terand and CGB knew of this working arrangement.

Prior to the VICKI LYNNE proceeding southbound, its deckhand, Kevin Burch, placed portable red, green and amber Empco Model 100 lights on the head of the tow to be used as navigation lights. As confirmed by the testimony of deckhand Burch and Alan Alario, these lights were provided by Alario, who ran St. Charles' day to day operations.[6] The red and green side lights were unscreened lights designed to be visible through 360 degrees. The lights were designed to be powered by two six-volt batteries, powering a bulb precisely mounted by a candle mechanism within a fresnel lens, to intensify the bulb's power. Sometime in the past, St. Charles had removed the lights' interior components, substituting an inadequate bulb, mounted on a short pigtail socket[7], which was hand wired to a single six volt dry cell.

This Court carefully reviewed the configuration of similar new lights, both as origi-

---

**4.** See FREEPORT Exhibit No. 47.

**5.** Captain Rose held a valid and current U.S. Coast Guard license as an operator of uninspected towing vessels and was at the helm of the VICKI LYNNE. Captain Rose had some experience as a Captain on towing vessels operating in the Mississippi River.

**6.** Alario testified he bought the lights from "different stores", and although he did not know the price, he was "sure there were more expensive ones." Because the Court concludes the inadequacy of the lights was a proximate contributing cause of the collision, Alario's grossly misplaced economies ended by costing millions.

**7.** See FREEPORT Exhibit 60.

nally manufactured and with St. Charles' modifications. The Court also viewed the lights with the Courtroom lights off to further evaluate their visibility. The Court finds that even as originally manufactured, the lights supplied by St. Charles were of inadequate visibility and did not meet applicable Coast Guard specifications, which fact was confirmed by the testimony of Coast Guard Lieutenant Scott E. Hartley and the light designer and manufacturer, Henry Linder.[8] St. Charles' modifications further reduced the lights' visibility. Nevertheless, deckhand Burch positioned the green light on the starboard head, a red light on the port head, and a flashing amber light at the mid section of the tow. Burch testified all three lights were bright and burning that night, but the Court specifically finds the lights were dim, and even if burning, would have not offered sufficient indication of the vessel's position.

In addition, St. Charles did not provide the VICKI LYNNE with charts of the Mississippi River, compass, or Rules of the Road to aid its operator in navigation. St. Charles did not provide any guidance or instruction regarding the maneuvering capabilities of VICKI LYNNE, maximum number of barges it could safely handle or any guidance regarding tow construction or configuration. Instead, St. Charles adopted a "hands off" management style, leaving all decisions to the tug operators.

On the evening of December 12, 1987, the weather was good. The Mississippi River gauge at Carrollton was about 3.69 feet, giving an average downstream current of about two miles per hour.

At 2110 hours, while entering the New Orleans Harbor area, the FREEPORT was joined by Captain Charles Ponamsky, a licensed compulsory pilot, to assist in its up river navigation. He had previously piloted FREEPORT on the Mississippi River.

Following the pilot change, the FREEPORT's bridge watch consisted of its master Captain Karlukas Constadinos, third officer Gealon Benjamin, helmsman Virgilio Buenscsco, lookout Gilberto Macabeles and the pilot. The master directed the FREEPORT's bosun Apostolos Gabicrakis to standby on the foc'sle head. The navigating equipment aboard the FREEPORT was working properly during the up river passage. The FREEPORT's starboard bridge radar was on, while its port radar unit was kept on standby, ready for use as necessary. The FREEPORT's two bridge VHF radios were on, monitoring channels selected by the pilot. Additionally, the pilot used a hand-held VHF radio to speak with navigators on approaching vessels. The FREEPORT also participated in the Coast Guard's Vessel Traffic Service. The FREEPORT's engine was controlled directly from the bridge. It was kept on hand steering, with two quarter masters relieving each other at hourly intervals. Although everything was at that time, in good order on board the FREEPORT, these proper operating procedures proved of no avail in preventing the collision.

Shortly after 2300 hours, as the FREEPORT approached the lower end of Fairview crossing (Mile 115 AHP),[9] it slowed so that a launch could come alongside and deliver two new crew members to the vessel. At 2328 hours, after the transfer was complete, the FREEPORT's master determined visually and by radar that the reach ahead was clear and left the bridge for a few moments to settle the new crew members.

8. See FREEPORT Exhibit 55. See also Inland Collisions Regulations, Rule 24(f)(i) and FREEPORT Exhibits 61 and 62. Displaying a blatant lack of responsibility, Rose, Burch and Alario all testified they had no idea whether the lights were Coast Guard approved, which they were not. Incredibly, not even this collision was sufficient to cause them to educate themselves on this topic.

9. The Mississippi River above Fairview Crossing is a relatively straight, three mile reach ending at St. Rose Point, located at mile 118 Above Head of Passes (AHP). The river proceeding upstream of St. Rose Point turns to the right. Across from St. Rose Point on the right descending (west) bank is the ADM/Growmark wharf (formerly Farmer's Export). On the left descending band, under St. Rose Point, is the Tulane Barge Fleet, which on December 12, 1987, was heavily loaded with grain barges with some tiers projecting 9–10 barge widths into the river.

Meanwhile, the VICKI LYNNE flotilla had departed the CGB fleet at Mile 132 bound down river for Continental Grain Company (Mile 103 AHP), at about 2100 hours, a passage which the VICKI LYNNE's operator anticipated would consume 3–4 hours. The VICKI LYNNE did not participate in the Coast Guard's Vessel Traffic Service, nor had St. Charles instructed its operator to do so, so there was no notice to others navigating the river of its position except by direct visual or audio contact.

At about 2330 hours, the FREEPORT's pilot, by radio, entered a meeting agreement with VICKI LYNNE, then above St. Rose Point. VICKI LYNNE's operator requested the vessels meet, as is customary is this area, port to port, with the FREEPORT to favor the left descending (east) side of the river, while the VICKI LYNNE was to favor the right descending (west) side. The FREEPORT's pilot agreed.

Immediately after the VICKI LYNNE agreement, FREEPORT's pilot entered into a meeting agreement with the tug SCARLET GEM, which was delivering two barges to Tulane Fleet (on the east bank). SCARLET GEM's operator indicated he would hold very close to the east bank for a starboard to starboard (two whistle) passing.

Several minutes later, those navigating FREEPORT observed a tug emerge from behind St. Rose Point, close to the east bank, where the FREEPORT's pilot expected to see SCARLET GEM. It is apparent that at this point in time, the pilot did not realize the SCARLET GEM had passed. The pilot then called to the VICKI LYNNE requesting its operator flash its searchlight so that the VICKI LYNNE's position could be ascertained. The VICKI LYNNE's operator complied by flashing the searchlight, identifying it for the first time to the pilot as the VICKI LYNNE, even though the

FREEPORT's lookout testified he had previously warned of the approaching tug.[10]

Because of VICKI LYNNE's position close to the east bank, the port to port meeting in which FREEPORT would pass between the moored barges at Tulane Fleet and the VICKI LYNNE flotilla would have been tight.[11] The Court finds, however, that immediate change in the meeting was not feasible due to the relative positions of the vessels, and the FREEPORT had enough room to effectuate a one whistle (port to port) pass.[12] Nonetheless, the FREEPORT pilot, by then in an apparent panic, called to the VICKI LYNNE's operator by radio for a change in the passing agreement one to two minutes before collision, and VICKI LYNNE's operator agreed.

At the last minute, the FREEPORT turned to the left across the bow of the tow. The VICKI LYNNE flotilla was unable to stop or turn.

The Court finds that the poor lighting of the VICKI LYNNE was a proximate contributing cause of the collision. The size and make-up of the tow in conjunction with the tug's limited horsepower also limited the tug and tow's maneuverability and constituted another proximate contributing cause of the collision. However, the FREEPORT pilot's apparent confusion of the SCARLET GEM and the VICKI LYNNE, his last minute change of the passing agreement and his turn across the bow of the tow were also proximate contributing causes of the collision.

Those navigating the FREEPORT also failed to use available means to remedy the pilot's confusion: Specifically, the pilot himself did an inadequate job of monitoring the radar units on the bridge; Macabeles, his bridge lookout, was not familiar with the inland rules governing navigation on the Mississippi River; the pilot did not tell Macabeles about the meeting arrange-

---

10. See Deposition of Gabrielakas Apostolos, p. 10.

11. The Captain of the SCARLET GEM, Melvin Williams, testified the FREEPORT had enough room to effect a port to port passing, but confirmed it would have been tight.

12. See Deposition of Gabrielakas Apostolos, p. 20, lines 9–15, p. 45, lines 9–11; pp. 57, line 9 to 58, line 16.

ments with the VICKI LYNNE or SCARLET GEM, nor did Macabeles report the downward SCARLET GEM to the pilot; the pilot did not even ask Macabeles about the FREEPORT's clearance to port or starboard prior to the collision; linguistic differences apparently resulted in a total lack of communication between the bow lookout and the pilot, who was apparently unaware there even was a bow lookout; and Gealon, the third mate left in command of the vessel at the time of the casualty when the master went below, was never told that the FREEPORT and VICKI LYNNE had agreed to a port to port meeting.

The FREEPORT interests candidly admitted at trial that following the collision, the master ordered the engine room and bridge crew to enter a fabricated "stop" order at 2332 in the bridge and engine room bell books. This attempted fabrication confirms that those aboard the FREEPORT knew there were significant errors in the navigation of that vessel which contributed to the collision.

Another contributing factor is that neither vessel sounded a danger signal.

The Court accordingly concludes that the fault of the VICKI LYNNE interests is 50% responsible for the collision and the fault of the FREEPORT interests is likewise 50% responsible for the collision.

### Conclusions of Law

This case arises under this Court's admiralty and maritime jurisdiction, Rule 9(h) of the Federal Rules of Civil Procedure. The waters involved in this case are governed by the Navigational Rules for Inland Waters, 33 U.S.C. §§ 2001, et seq.

### 1. The Collision

Vessels approaching each other on the Mississippi River at their option may arrange to meet either port to port or starboard to starboard. *See Canal Barge Co. v. China Ocean Shipping Co.*, 770 F.2d 1357 (5th Cir.1985). The VICKI LYNNE, as downbound vessel, with the current underfoot had the right to propose the manner in which VICKI LYNNE and FREEPORT would meet and pass. 33 U.S.C.

§ 2014(d) (Inland Rule 14(d)). The FREEPORT's and VICKI LYNNE's agreement to meet port to port was appropriate, pursuant to the "Point Bend" custom of vessel navigation on the Mississippi River. *See Canal Barge Co. v. China Ocean Shipping Co.*, 770 F.2d at 1361; *Gulf Coast Transit Co. v. M/V BAYOU LIBERTY*, 1978 AMC 969, 973 (E.D.La.1977). Once meeting arrangements were made, each vessel operator was entitled to presume that the other would act lawfully, with FREEPORT to favor the left descending (east) side of the river while VICKI LYNNE held to the west:

> Each of [the] vessels was entitled to presume that the other would act lawfully; would keep to her own side....

*THE VICTORY*, 168 U.S. 410, 426, 18 S.Ct. 149, 156, 42 L.Ed. 519 (1897).

However, when the VICKI LYNNE's operator identified his tow by flashing his searchlight, FREEPORT Pilot Ponamsky first perceived which vessel the FREEPORT was meeting, and in his apparent panic, concluded that the appropriate and agreed port to port meeting could not be safely achieved. The FREEPORT's pilot therefore notified the VICKI LYNNE's operator by radio that the port to port meeting was impossible and requested a starboard to starboard meeting. Having little choice in light of the exigent circumstances perceived by the FREEPORT, the VICKI LYNNE's operator confirmed the starboard to starboard meeting but, because of tow configuration and VICKI LYNNE's low power, the tug was unable to maneuver to assist in accomplishing the last minute change.

Several factors contributed to the inability of the FREEPORT and VICKI LYNNE to properly effect their passing agreements: Those factors included grossly inadequate lighting of the tug; inadequate powering for the flotilla size and configuration; inadequate equipment to permit accurate vessel placement and the tug crew's excessively long working hours; and the FREEPORT pilot's confusion over which vessel was the VICKI LYNNE, notwithstanding available means to remedy this

confusion,[13] including the use of lookouts and the vessel's working radar. Attempts at communication between the pilot and lookouts were also notoriously inadequate. These factors constitute fault on the part of both the VICKI LYNNE and the FREEPORT, and each vessel's fault was a contributing proximate cause of the collision.

### 2. Limitation of Liability

■ Tugs underway for periods longer than 12 hours must be manned by at least two licensed vessel operators. *See* 46 U.S.C. § 8104. The VICKI LYNNE had been in constant operation since 1200 hours on December 12 when its single licensed operator boarded. At 2100 hours, when the VICKI LYNNE commenced its passage, its owner and operator knew that completion of the first leg, that is, to Continental Westwego Mile 103, would have required he work more than 12 hours. The VICKI LYNNE's voyage commencement, when it would shortly have been in statutory violation, is a contributing cause of the collision.

With respect to lighting, the Inland Rules provide in pertinent part:

> The lights prescribed in these Rules shall have an intensity as specified in Annex I to these Rules, so as to be visible at the following minimum ranges:
> (b) In a vessel of 12 meters or more in length,
>
> .    .    .    .    .
>
> but less than 50 meters in length:
> —a side light, 2 miles;
> —a special flashing light, 2 miles.

33 U.S.C. § 2022.

Annex I, Section 84.15(b) to the Inland Navigation Rules provides where the range of visibility (luminous range) of light in nautical miles required is 2, the minimum luminous intensity of light in candelas (candle power) is 4.3. St. Charles provided non-Coast Guard approved battery powered lights generating only .6 candelas, a statutory violation, which was a contributing cause of the collision.

For St. Charles and/or Terand to have the advantage of limitation of liability, both must show the loss or injury was occasioned "without the privity or knowledge of such owner or owners ..." 46 U.S.C.App. § 183(a). In *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 591, *rehearing denied*, 848 F.2d 498 (5th Cir.), *cert. denied* —— U.S. ——, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988), the Court stated:

> "Privity" as used in this statute means some fault or neglect in which the shipowner personally participates. "Knowledge" means personal cognizance or means of knowledge of which the shipowner is bound to avail himself. *Matter of Texaco, Inc.*, 570 F.Supp. 1272, 1278 (E.D.La.1983). The burden of establishing "lack of privity or knowledge" is on the shipowner. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir.1976).

Thus, St. Charles and Terand have the burden of showing the VICKI LYNNE's inadequate powering, lighting, manning, equipment and their lack of guidance all occurred beyond their privity and knowledge. Because they have not sustained this burden of proof, limitation must therefore be denied.[14] By contrast, the evidence showed St. Charles and Terand were well aware of 24 hour shifts worked by the VICKI LYNNE's operator, which knowledge defeats limitation of liability. *See Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365 (5th Cir.1983). The provision of inadequate lighting equipment to the VICKI LYNNE's tow was also known by St. Charles, as it provided the original portable lights which were inadequate for the purpose, as well as the parts to jury rig the lights after the internal components of the original lights were lost or discarded.

For the foregoing reasons, the Court concludes that both the VICKI LYNNE and the FREEPORT were at fault in causing the collision, and the Court apportions fault on a 50–50 basis between the two vessels. Limitation of liability is denied.

---

**13.** See Findings of Fact on p. 1202 above.

**14.** *See also Complaint of Cameron Boat Rentals, Inc.*, 683 F.Supp. 577 (W.D.La.1988).

**ORDER AMENDING FACT FINDINGS**

Upon further reflection, incited by the motion of Sealink Shipping Co. for amendment of two of the Court's findings, the Court makes the following additional findings:

■ One of the primary policies supporting compulsory pilot laws is the promotion of navigational safety by manning vessels with those having special knowledge of a port's local rules and customs. Thus, as a general rule, this Court would not expect a foreign able seaman to have a working knowledge of local navigational rules and would not predicate a finding of liability on a foreign seaman's ignorance of those rules. Moreover, in considering the issue of liability in this case, as in any other case, this Court most certainly holds the compulsory pilot responsible for such knowledge.

In this particular case, the tenor of arguments made by the owners of the FREEPORT suggested that the FREEPORT's liability should be lessened or entirely defeated due to the over-all excellence of and due care taken by the FREEPORT's crew. This Court's findings with regard to the expertise of the bridge look out are addressed to that argument, not as a statement that the look out had other obligations beyond those of seeing or hearing and reporting what he can see or hear or reasonably should have seen or heard. What is clear from the evidence in this case is that someone on the FREEPORT should have detected the presence of the VICKI LYNNE, whether by radar, radio or visual sighting, and taken steps to avoid it. That someone is primarily the compulsory pilot. However, it is to say the least unfortunate that, in this case, the pilot's inattentiveness was not rendered harmless by the vigilance of the crew. *See Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790, 798 & n. 6, *rehearing denied* 564 F.2d 97 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978).

■ This Court also expressly noted the FREEPORT crew's attempted fabrication of log entries. Given this occurrence, the FREEPORT interests took the only appropriate course of action, namely, to admit to the attempted fabrication and get on with the case. However, while the attempted fabrication is not of itself a sine quo non of liability, by the same token the FREEPORT's candor does not require the Court to ignore the attempted fabrication. This factor was one of many lending support to the Court's apportionment of liability, as it suggests an admission by those on the FREEPORT that they knew of significant errors in navigation of the FREEPORT.