United States Court of Appeals,

Fifth Circuit.

No. 94-30247

Summary Calendar.

MARINE TRANSPORT LINES, INC., Plaintiff-Appellee,

v.

TAKO INVADER MV, her engines, tackle, etc., in rem, et al., Defendants,

Tako Towing, Inc. and Lumar Marine, Inc., in personam, Defendants-Appellants.

Nov. 14, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before SMITH, EMILIO M. GARZA and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Marine Transport Lines, Inc. ("Marine Transport") brought an admiralty action against M/V Tako Invader, Lumar Marine, Inc., and Tako Towing, Inc. ("Tako Towing") to recover damages its barge sustained in a collision with the Tako Invader on the Mississippi River. Tako Towing appeals the district court's calculation of damages and apportionment of fault. Finding only a mathematical error in the court's calculation of damages, and an insufficient legal basis for its apportionment of fault, we affirm in part and remand in part.

I

In the early hours of a February morning, two barges in tow on the Mississippi River collided just below the Luling Bridge near mile 121.5. Marine Transport's tug, M/V Marine Guardian, with its

1

barge the MBC-2 in tow, was on its way up the river to Baton Rouge, Louisiana, where she was to load cargo for a journey to Mexico. She had been following a second tow, M/V Creole Rivers, for some time, unable to pass her because of downbound traffic. Finally, an opportunity to pass the Creole Rivers on her starboard side presented itself, and the Marine Guardian proceeded to overtake the Creole Rivers. This maneuver placed the Marine Guardian between the Creole Rivers and the east, or left-descending, bank of the river.

As the Marine Guardian slowly gained alongside the Creole Rivers, her mate, Captain Jack Sears, heard the Creole Rivers reach a port-to-port passing agreement with a downbound vessel, M/V Tako Invader. He saw the Tako Invader's lights above the Luling Bridge, on the east side of the river,[1] but he soon lost them in the bridge's supports. The movement of the lights suggested to Captain Sears that the Tako Invader was slipping toward the west bank. Captain Sears did not communicate with the Tako Invader. Instead, he assumed that because he was on the eastern side of the river, safely to starboard of the Creole Rivers, he too could pass the Tako Invader port-to-port.[2]

---

[1]Captain Schipplein, the mate of the Tako Invader, confirmed this location in his deposition when he testified that when he saw the Luling Bridge range lights they were open, and the downriver light was positioned to the left of the upriver one. Although Captain Schipplein changed this testimony at trial, the court found his trial testimony incredible.

[2]Captain Schipplein testified that from the Tako Invader's vantage point, he saw a green barge light downriver below the Luling Bridge and assumed it was a loose barge positioned sideways in the river.

Captain Sears did, however, send a deckhand named Rowe top-side to observe the Tako Invader. Rowe rushed back to the wheelhouse, grabbed some binoculars, and returned top-side. When he ran back down to the wheelhouse again, he informed Captain Sears, "You'd better do something, [the Tako Invader's] right ahead of you." Captain Sears then heard an excited conversation on his radio between the Tako Invader and the Creole Rivers, and about a minute later, according to Captain Sears, "I knocked the shit out of him or he knocked the shit out of me, one way or another."

Marine Towing sued Tako Towing in admiralty, alleging that the Tako Invader's negligent operation and failure to adhere to the applicable navigational rules caused the collision and resulting damage to Marine Towing's barge. The district court found the Tako Invader in violation of Rules 7, 8, 9, and 14 of the Inland Navigational Rules ("the Rules"), and the Marine Guardian in violation of Rules 7, 8, 14, and 34. Based on this finding, the court apportioned 757 of the fault to the Tako Invader and 257 to the Marine Guardian. Consequently, the court awarded Marine Transport detention damages in the amount of $61,072.50 and repair costs in the amount of $80,374.77. Tako Towing now appeals, arguing that the district court's findings were clearly erroneous and that the court misinterpreted Rules 9 and 14.

II

A

Tako Towing argues that the district court incorrectly calculated Marine Transport's damages. Determinations of the trial

3

court concerning the amount of damages are factual findings, and we will set them aside only if clearly erroneous. *See Todd Shipyards Corp. v. Turbine Serv., Inc.,* 674 F.2d 401, 405 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982). "A finding is "clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Specifically, Tako Towing contests the district court's calculation of detention damages, the profits that Marine Transport lost while its vessel was detained for collision repairs. "A ship owner is entitled to damages for the loss of use of its vessel in addition to the cost of repairs of the vessel." *Kim Crest, S.A. v. M.V. Sverdlovsk,* 753 F.Supp. 642, 649 (S.D.Tex.1990) (citing *Continental Oil Co. v. S.S. Electra,* 431 F.2d 391 (5th Cir.1970), *cert. denied,* 401 U.S. 937, 91 S.Ct. 925, 27 L.Ed.2d 216 (1971)). "The damage that this loss represents is the ship's charter rate, less the variable or incremental expenses that would have been required of the owner to perform the charters, discounted by the probable utilization rate." *Kim Crest,* 753 F.Supp. at 649. Loss of detention damages "need not be proven with an exact degree of specificity." *Mitsui O.S.K. Lines, K.K. v. Horton and Horton, Inc.,* 480 F.2d 1104, 1106 (5th Cir.1973). A district court's lost profits methodology must permit it to arrive at a damages amount "with "reasonable certainty.' No more is required." *Orduna S.A.*

4

*v. Zen-Noh Grain Corp.,* 913 F.2d 1149, 1155 (5th Cir.1990) (quoting *The Conqueror,* 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897)). The evidence must be sufficient to allow the district court to "find with reasonable certainty that the damages claimed were actually or may be reasonably inferred to have been incurred as a result of the collision." *Id.*

Tako Towing first argues that the district court erroneously failed to reduce Marine Transport's detention damages by an "historical utilization rate," a rate that reflects the portion of a typical time period that the vessel does not earn revenue. The district court applied the traditional "three voyage rule" to calculate detention damages. According to this rule, "the court determines the charter hire rate for the voyage immediately preceding the collision, the charter hire rate during the voyage of the casualty, and the charter hire rate of the first voyage succeeding the casualty and averages them." *Kim Crest,* 753 F.Supp. at 650; *see also Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995, 1001 (5th Cir.1984) (noting the "time honored rule in maritime cases that a proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after"). The court calculated, based on historical data for the three voyages closest in time to the collision, that the Marine Guardian and MBC 2 earned an average revenue of $105,000 per voyage. The Court then deducted $25,255 to account for the estimated average variable costs associated with those three voyages.

Tako Towing cites our decision in *Todd Shipyards v. Turbine Serv., Inc.,* 674 F.2d 401 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982), to support its argument that the district court's failure to apply a utilization rate was clear error. That case, however, involved an entirely different methodology. There, the damaged vessel was detained 215 days, during which time the vessel could have made several voyages. *Id.* at 414. The district court calculated a daily loss of profit and then multiplied this cost by the number of days the vessel was detained. Since the vessel in that case historically had been operational 77.27 of the time, this necessarily required a reduction to account for the amount of time the vessel would not have earned any profit. *Id.*

In contrast, the Marine Guardian essentially missed one voyage. At the time of the collision, she was on her way to Baton Rouge, where she was to load cargo at an Exxon Chemical facility for a voyage to Mexico. Presumably because the voyage was expected to take between 12 and 15 days, and the Marine Guardian was detained for collision repairs for 14.3 days, the district court did not discount Marine Transport's detention damages to reflect a probable rate of utilization. In effect, the district court assumed a utilization rate of 1007 for those 14.3 days.[3] Because

_____

[3]Tako Towing also argues that because the Marine Guardian was eventually able to make the voyage to Mexico for Exxon, "the voyage was never lost, but rather, was only delayed." This argument is beside the point. The Marine Guardian missed fourteen days of earning revenue. Her ability to make a delayed voyage simply means she made one instead of possibly two voyages in that same amount of time. Furthermore, a plaintiff seeking

6

the expected length of the Marine Guardian's impending voyage approximately equalled the number of days she was detained for collision repairs, a probable utilization rate of 100% permitted the district court to arrive at Marine Transport's detention damages with reasonable certainty. *See Inland Oil and Transp. Co. v. Ark-White Towing,* 696 F.2d 321, 326-27 (5th Cir.1983) (holding that loss of use was not proved with reasonable certainty where there was "no evidence that the ... barges *would have been used* during this time span.").

Tako Towing also claims the district court erroneously relied on Marine Transport's estimates of its variable costs. Variable costs are deducted from the charter rate to arrive at lost profits. *See Kim Crest,* 753 F.Supp. at 649. Jeff Miller, Marine Transport's charter manager, testified at trial regarding the variable costs for the three voyages that the court used to calculate the Marine Guardian's charter rate. He explained that he estimated the variable costs based on historical costs of similar voyages. With respect to fuel costs, for example, Miller testified that he input average speed and fuel consumption into a computer program that calculates the fuel a vessel would burn on a voyage of a given distance and speed. Actual figures were unavailable because Marine Transport accounts for its costs on a monthly rather than per-voyage basis.

---

detention damages need not prove a specific lost opportunity. *See In re M/V Nicole Trahan,* 10 F.3d 1190, 1195 (5th Cir.1994) (holding proof of active market for vessel sufficient to entitle plaintiff to detention damages).

Tako Towing concedes that a damages award may be based on estimates, but argues that "it is necessary that the assumptions rest on adequate data." *Malley-Duff & Assocs. v. Crown Life Ins. Co.,* 734 F.2d 133, 148 (3rd Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984). Miller's testimony shows, however, that his estimates were prepared based on historical data for similar voyages. Although actual invoices for the three voyages would have been preferable, Marine Transport's estimates were not so speculative that the district court could not find with "reasonable certainty" that the damages claimed may be "reasonably inferred to have been incurred as a result of the collision." *Mitsui O.S.K. Lines,* 480 F.2d at 1106.

Finally, Tako Towing points out an error in the district court's arithmetic. The court found detention damages to be $105,000 in lost revenues minus $25,255 for variable costs saved. Seventy-five percent of this amount ($79,745) is $59,808.75, but the figure included in the court's final judgment is $61,072.50. Accordingly, if the district court's apportionment of fault does not change on remand, *see infra* part II.B, we order the judgment modified in this respect.

B

Tako Towing also appeals the district court's apportionment of fault, primarily on the ground that the court misinterpreted the Inland Navigational Rules. We review the trial court's factual finding of relative fault in a collision under the clearly erroneous standard. *Inland Oil & Transp. Co. v. Ark-White Towing,*

8

696 F.2d 321, 326 (5th Cir.1983). However, when factual findings in an admiralty case are "essentially based on an incorrect legal principle, Rule 52(a) clearly erroneous does not apply and we disregard any such possible findings." *Delta S.S. Lines v. Avondale Shipyards,* 747 F.2d 995, 1000 (5th Cir.1984).

The district court found that the Tako Invader violated Rules 7, 8, 9, and 14, and that the Marine Guardian violated Rules 7, 8, 14, and 34. When both parties to a collision have violated statutory regulations designed to prevent collisions, the trier of fact apportions fault between the vessels unless either vessel proves that its fault was not a substantial contributing cause of the collision. *See Otto Candies, Inc. v. M/V Madeline D,* 721 F.2d 1034, 1036 (5th Cir.1983); *see also United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715-16, 44 L.Ed.2d 251 (1975) ("We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault....").[4]

The court's bench ruling points to two areas of fault underlying its apportionment of 757 fault to the Tako Invader. First, the court found that Captain Schipplein failed to exercise sufficient caution after noticing what he concluded was a sideways

---

[4]Tako Towing does not contest the court's finding that both vessels' violations contributed to the collision (requiring an apportionment of liability). Tako Towing contests only the 75-25 ratio of the court's allocation of fault.

barge downriver. Second, it held that "because the Tako Invader was on the eastern side of the river, contrary to the agreed to port-to-port passage as set out in Rules 9 and 14 of the Inland River Navigational Rules, she was in violation of the statute." Tako Towing challenges the second of these conclusions on two grounds.

First, Tako Towing argues that the court erroneously applied Rule 9, the "Narrow Channel Rule,"[5] because the channel in which the collision occurred is 1200 feet wide and therefore not a "narrow channel."[6] Neither Rule 9 nor the Inland Navigational Rules Act defines "narrow channel." Courts interpreting the predecessor "Narrow Channel Rule," Article 25 of the Inland Rules, 33 U.S.C. § 210 (1976) (repealed), agreed that the determination of what is a "narrow channel" is a mixed question of law and fact. *Canal Barge Co. v. China Ocean Shipping Co.,* 770 F.2d 1357, 1362 (5th Cir.1985). Lower courts have generally held that bodies of water up to 1,000 feet wide are narrow channels, while bodies of water 1,200 feet and over are not. *See Maritrans Operating Partners L.P. v. M/T Faith I,* 800 F.Supp. 133, 140 (D.N.J.1992) (citing cases). However, we have explained that "[t]he application

---

[5]Rule 9 generally requires vessels to proceed through "narrow channels" staying to their starboard side of the channel. *See infra* at 739-40.

[6]The "A Span" of the Luling Bridge, between the two main pilings, is 1200 feet wide. The actual width of the Mississippi River at that location is significantly greater. Although the court did not expressly find that the channel near the Luling Bridge is a narrow channel, its finding is implicit in its determination that the Tako Invader violated Rule 9.

10

of the Narrow Channel Rule is not based on the physical dimensions of the body of water alone." *Weathers Towing, Inc. v. M/V Herman Pott,* 570 F.2d 1294, 1295 (5th Cir.1978) (interpreting Inland Article 25, 33 U.S.C. § 210 (1976) (repealed)). In *Weathers Towing,* we upheld the district court's application of Rule 9 to Scudder Bend, a 1,200-foot wide section of the Mississippi river, based on the presence of sandbars, the length and width of the vessels, and the fact that the channel curved 180 degrees at Scudder Bend. *Id.* at 1295-96. Because the physical dimensions of the Luling Bridge channel place it outside the general range developed by other lower courts, and because the district court failed to make the necessary findings, like those in *Weathers Towing,*[7] we remand for explicit findings on the question of whether the Luling Bridge section of the Mississippi is a "narrow channel" within the meaning of Rule 9.

Assuming Rule 9 applies, Tako Towing also argues that "[n]o rule, and particularly not Rules 9 or 14 ..., requires that a vessel stay on one side or the other of a non-existent imaginary line down the center of the river." Rule 9(a) provides:

> (i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.

> (ii) Notwithstanding paragraph (a)(i) and Rule 14(a), a power-driven vessel operating in narrow channels or fairways

---

[7]The court below appears to have assumed, without deciding, that Rule 9 applied.

on the Great Lakes, Western Rivers,[8] or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner and place of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i), as appropriate. The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

33 U.S.C. § 2009(a) (1988). Rule 14 provides:

(a) Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other.

....

(d) Notwithstanding paragraph (a) of this Rule, a power-driven vessel operating on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i) as appropriate.

33 U.S.C. § 2014 (1988). Relying on Rule 9(a)(ii) and Rule 14(a)(ii), Tako Towing argues that as the downbound vessel, the Tako Invader had the right-of-way and the Marine Guardian was required to stay clear. Marine Transport, on the other hand, interprets the rules as requiring vessels to proceed up and down the Mississippi on their starboard side of the river. The court's finding that the Tako Invader was positioned on the east side of the river is irrelevant under Tako Towing's interpretation of the rules and conclusive under Marine Transport's. We conclude that neither interpretation fully captures the meaning of Rules 9 and 14.

---

[8]The statute defines the term "Western Rivers" to include the Mississippi River. *See* 33 U.S.C. § 2003(l).

Rule 9 explicitly directs vessels to keep as near to their starboard side as "is safe and practicable." 33 U.S.C. § 2009(a)(i). The court's finding that the Tako Invader was proceeding down the East side of the channel (the side to the Tako Invader's port) placed the Tako Invader in clear violation of Rule 9(a)(i). The question then becomes whether the "right-of-way" provision of Rule 9(a)(ii) allowed the downbound Tako Invader to take the course she did. This question requires us to reconcile Rule 9's potentially contradictory subsections (a)(i) and (a)(ii): one requires vessels to stay to their starboard side of the river, and the other gives downbound vessels the right-of-way. The parties have cited no cases, and we have found none, reconciling this conflict.[9]

We do not read Rule 9(a)(ii)'s right-of-way provision to allow downbound vessels absolute freedom to proceed down the Mississippi River however they choose. Instead, it gives downbound vessels the authority to deviate from the "keep to starboard" requirement of Rule 9(a)(i) provided they comply with the procedures enumerated in Rule 9(a)(ii). In other words, the downbound vessel's right-of-way under Rule 9(a)(ii) is conditional—it depends on the downbound vessel's having proposed a manner and place of passage and

---

[9]Marine Transport cites two cases in support of its interpretation of Rules 9 and 14: *Hess Tankship Co. v. S.S. M.L. Gosney,* 230 F.Supp. 1 (E.D.Va.1963), and *Koch-Ellis Marine Contractors, Inc. v. The Capetan Dimitris,* 176 F.Supp. 645 (E.D.La.1959), *aff'd,* 302 F.2d 462 (5th Cir.1962). Neither of these cases are relevant, however, because they were decided before the Inland Navigational Rules Act of 1980. *See infra* pp. 740-42.

13

initiated the maneuvering signals prescribed by Rule 34(a)(i), as appropriate.  When the downbound vessel exercises its authority under Rule 9(a)(ii), the upbound vessel must give way, even "hold as necessary to permit safe passing."  33 U.S.C. 2009(a)(ii).

The legislative history of Rule 9 supports this interpretation of the rule.  Rule 9 was among the rules Congress enacted in the Inland Navigational Rules Act of 1980 ("INRA"), Pub.L. No. 96-591, 94 Stat. 3415 (codified as amended at 33 U.S.C. §§ 2001-73 (1988)). The INRA was designed to unify the rules governing navigation in the inland waters of the United States by replacing the existing Inland Rules, Western Rivers Rules, and Great Lakes Rules with a consolidated set of "Inland Navigational Rules."  *See* S.Rep. No. 979, 96th Cong., 2d Sess. 1 (1980) ("INRA Senate Report"), *reprinted in* 1980 U.S.C.C.A.N. 7068;  INRA § 8, 94 Stat. at 3435-36.  The Senate Report accompanying the INRA explains the source of Rule 9's potential internal conflict:

> There is presently no requirement on the Western Rivers for vessels to keep to the starboard side of a channel.  This new rule, however, requires compliance by all vessels and not solely steam vessels (now described as "power-driven vessels") on all waters.  The rule places a burden on a vessel which is on the port side of a channel to have a need for being there or to establish agreement for a starboard-to-starboard passage.
>
> Rule 9(a)(ii) is not found in the 72 Colregs [10] and is the result of a requirement for different rules because of peculiar of special operating conditions on certain inland waters.  This rule is similar to existing Western Rivers Rule 19, existing Western Rivers Pilot Rule 95-11, and existing Great Lake Rule 24.  It recognizes the limited maneuverability

---

[10]Congress modeled most of the INRA on the International Regulations for Preventing Collisions at Sea, 1972 ("72 Colregs").  *See* INRA Senate Report at 1.

of a downbound vessel and the occasional need to deviate from Rule 9(a)(i) as a result of river current patterns when rounding a bend in twisting, narrow channels and fairways. Giving the right-of-way and choice in passing to downbound vessels, with a following current, in the waters designed [sic] in Rule 9(a)(ii) is considered essential for the safety of navigation in narrow channels and fairways.

INRA Senate Report at 9-10, *reprinted in* 1980 U.S.C.C.A.N. at 7077.

In effect, Congress merged the "keep to starboard" requirement of the former Inland Narrow Channel Rule, 33 U.S.C. § 210 (1976) (repealed), with the downbound vessel's right-of-way under the former Western Rivers Narrow Channel Rule, 33 C.F.R. § 95.11 (1978) (repealed). The Senate Report clarifies that the downbound vessel's right-of-way does not entitle her generally to ignore the "stay to starboard" rule of Rule 9(a)(i), but rather entitles the downbound vessel to deviate from the default rule of 9(a)(i) as circumstances may require. The plain language of the rule, in turn, requires downbound vessels exercising this option to propose the manner of passage and initiate any necessary maneuvering signals.

With respect to Rule 14, we agree with Tako Towing that it alone does not require "that a vessel stay on one side or the other of a non-existent imaginary line down the center of the river." Indeed, if Rule 14 required vessels to keep to their starboard side of the river, this would render Rule 9(a)(i) redundant.[11]

_____

[11]We also note that such a rule would be inconsistent with the point-bend custom on the Mississippi River which requires frequent departures from the port-to-port passing default rule. "According to this custom, the northbound vessel navigates upriver by going "over the points,' that is, by navigating close to the points, while the southbound vessel "runs the bends,' that is, adheres as closely to the bends as safe navigation allows.

15

Nevertheless, Rule 14's requirement that vessels pass port-to-port does make a vessel's course and location on the river relevant to a determination whether she violated Rule 14. For example, a court could reasonably conclude that a downbound vessel's position on the east side of the channel prevented her from being able to pass an upbound vessel port-to-port as required by the rule.

We further hold that Rule 14(d)'s right-of-way for downbound vessels modifies Rule 14(a) in the same way that Rule 9(a)(ii) modifies Rule 9(a)(i). Specifically, Rule 14(d) gives a downbound vessel on the Mississippi authority to depart from the default requirement of a port-to-port passing, provided she complies with the requirements of Rule 14(d). As with Rule 9(a)(ii), we have found no case law interpreting the interaction of Rules 14(a) and (d). However, because Rule 14(d) is nearly identical to Rule 9(a)(ii), Rule 9(a)(ii)'s legislative history is similarly relevant.[12] In addition, pre-INRA cases are more informative on the question of the interaction between Rule 14(a) and 14(d) than with respect to Rule 9. Former Western Rivers Rule 18, 33 U.S.C. § 343

---

This practice permits traffic proceeding upriver to avoid the strong current by taking advantage of the slack water beneath the point and allows the less maneuverable traffic proceeding downriver to run with the current into the bends." *Canal Barge Co. v. China Ocean Shipping Co.,* 770 F.2d 1357, 1361 (5th Cir.1985).

[12]In fact, Rule 9(a)(ii) modifies both Rule 9(i) and 14(a). *See* 33 U.S.C. 2009(a)(ii) ("Notwithstanding paragraph (a)(i) and Rule 14(a)...."). The right of way provision of Rule 14 was added to the Rules in 1984, *see* Act of Oct. 30, 1984, Pub.L. No. 98-557, § 16, 98 Stat. 2860, 2867 (1984), but the reference in Rule 9(a)(ii) to Rule 14(a) was not removed, making the provisions redundant.

(1976) (repealed) required vessels meeting end on to pass port-to-port and at the same time gave downbound vessels the right-of-way. Cases interpreting the right-of-way provision of former section 343 support our interpretation of Rule 14. In *Inland Oil Transp. Co. v. Ark-White Towing Co.,* 514 F.Supp. 500 (E.D.La.1981), *modified in part,* 696 F.2d 321 (5th Cir.1983), for example, the court applied Western Rivers Rule 18 to a collision between a downbound and an upbound vessel on the Mississippi River. The district court found the downbound vessel 257 liable because she navigated too close to her port side of the river, notwithstanding her right-of-way, and we affirmed the court's finding. *See* 696 F.2d at 326; 514 F.Supp. at 502.

In sum, we hold that a vessel descending the Mississippi River must adhere to the default requirements of Rules 9 and 14 (that is, stay to starboard through a narrow channel and generally pass port-to-port) unless otherwise agreed; however, downbound vessels may force a departure from these default rules provided they comply with the requirements in Rules 9(a)(ii) and 14(d) that they propose the manner of passage and initiate maneuvering signals prescribed by Rule 34(a)(i), as appropriate. The district court in this case found that "because the Tako Invader was on the eastern side of the river, contrary to the agreed to port-to-port passage as set out in Rules 9 and 14 ..., she was in violation of the statute." However, the Tako Invader's position on one side or the other of the center of the river does not conclusively establish that she violated Rule 14, and the court did not make the findings

necessary to support its application of Rule 9.  Consequently, we remand this issue for further consideration.[13]

Tako Towing's remaining arguments regarding the court's apportionment of fault essentially restate its position at trial: that Marine Guardian's failure to hold up under the bridge, radio Tako Invader, or take evasive action prior to the collision warrants more than a 257 share of the fault behind the collision. The district court concluded that the Marine Guardian violated the Inland Navigational Rules in all of these respects,[14] and Tako Towing's sole complaint is the relative fault that the court attached to these violations.  If on remand the court finds that the Tako Invader violated Rules 9 and 14, we cannot say that a 75-25 apportionment of fault in favor of Marine Transport would be clearly erroneous.

                              III

For the foregoing reasons, we AFFIRM in part and REMAND in part.

---

[13]We note that this question becomes all the more important if the court finds on remand that Rule 9 does not apply to the Luling Bridge channel.

[14]It is unclear from the court's ruling what rule the Marine Guardian violated when she failed to hold up under the bridge. The court found that the Marine Guardian violated Rule 14 (presumably 14(d)), but if failing to hold up under the bridge violated Rule 14(d), then it would also necessarily violate Rule 9(a)(ii).  The court did not find the Marine Guardian in violation of Rule 9, however;  we therefore instruct the district court to reconsider this issue on remand.