United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 4, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-41085

In Re: In the Matter of the Complaint of LUHR BROTHERS INC, As Owner, Pro Hac Vice, Operator and/or Charterer of the M/V VICKIE, in a cause of Exoneration from and/or Limitation of Liability, Civil and Maritime

LUHR BROTHERS, INC., As Owner, Pro Hac Vice,
Operator and/or Charterer of the M/V VICKIE

Plaintiff-Appellant,

versus

CRYSTAL SHIPOWNING, PTE. LIMITED,

Claimant-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, JONES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Luhr Bros. Inc. ("Luhr") brought this civil and maritime action seeking exoneration from liability for property damage and loss arising from the M/V EAGLE AURIGA ("EAGLE") colliding into a drydock on the Sabine-Neches Waterway in August 1998. The drydock's owner, Vessel

Repair, Inc., suffered damages that have been stipulated at $475,000. The EAGLE, owned by Crystal Shipowning PTE. Ltd. ("Crystal") also sustained $40,000 in stipulated damages. Luhr operated the push-boat, M/V VICKIE ("VICKIE"). Crystal alleges that the VICKIE embarrassed the navigation of the EAGLE resulting in an allision. Luhr alleges that the trial court[1] clearly erred in finding the VICKIE at fault for the allision. For the following reasons, we affirm.

I. **Factual and Procedural Background**

A. The Stipulated Facts

The waterway in question runs northeast to southwest between the Port of Port Arthur and the Neches River. Northeast from Port Arthur, beacons 54 and 56 mark progress toward the Neches River. Upchannel from the beacons on the west bank is the R&R Marine Maintenance ("R&R") facility. Approximately one quarter mile north of the R&R facility is the Vessel Repair drydock which is also on the west bank. At the time of the incident, the dredge LOUISIANA was working about a mile above the drydock on the east bank. Upchannel from the drydock is the Atlantic Shipper wharf, the Pabtex coke dock, and an area called North 40 which are all on the west bank.

On the morning of August 24, 1998, the VICKIE and its tow were operating in the Sabine-Neches Waterway Canal, en route from the lower Mississippi River to Trinity Bay, Texas. Overall, the VICKIE and its tow are approximately 685 feet long and 70 feet wide. That same morning, the EAGLE, a tank ship, was the second of a convoy of three loaded tank ships headed from the Sabine Sea Buoy to the ship berths. The EAGLE was proceeding behind the BERYL and ahead of the

---

[1]Both parties gave pre-trial consent for disposition of this case by the U.S. Magistrate Judge. Pursuant to 28 U.S.C. § 636(c)(3), this case is properly before this Court.

ALDEBARAN. At the time of the accident K.I. Selinidis ("Selinidis") was the conning pilot on the EAGLE and James White ("White") was the captain of the VICKIE. Both Selinidis and White were properly licensed.

Before the accident, the MARINE DUVAL ("DUVAL") came to a berth at the R&R facility which is south of the drydock. Two tugboats, the HERMES and SPARTAN, were pushing perpendicular against the starboard side of the DUVAL to hold it in place portside-to the R&R. As the DUVAL was berthing at the R&R, the VICKIE and the EAGLE met and passed one another abeam of the two harbor tugs and the DUVAL. Shortly thereafter, the EAGLE's bow came into physical contact with the drydock, resulting in damage to the EAGLE and the drydock. The VICKIE did not come into physical contact with anything.

B.  The Testimony before the Magistrate Judge

Captain White and Captain Selinidis testified that before the allision, the EAGLE was outbound and had proceeded midway between beacons 54 and 56 when it first saw the VICKIE. At that point, the VICKIE was traveling inbound and was halfway between North 40 and the coke dock coming toward the EAGLE.  Most of the time, the EAGLE and the VICKIE proceeded on, or near, the centerline of the channel. The EAGLE and the VICKIE had slowed for other obstacles in the channel before increasing to full speed. When the EAGLE was in the vicinity of beacon 54, it became aware of the VICKIE which was between North 40 and the coke dock. White testified that it was physically possible to stop the VICKIE at the coke dock at this time. By the time the EAGLE communicated with the VICKIE, the EAGLE had passed beacon 56. At that time, the EAGLE maintained an

3

average ground speed of 9.6 miles per hour. Just before the allision, the EAGLE began corrective maneuvers for the bank suction and shear in the vicinity of the R&R.

Selinidis testified that he had been trying to raise the VICKIE by radio but received no response. He testified that the captain of the first ship in the convoy, the BERYL, came on the radio and said that the VICKIE would not respond and was going to cause an accident. According to Selinidis, immediately thereafter, White, the captain of the VICKIE, came on and said that he would pass the DUVAL and meet Selinidis and the EAGLE "in one whistle," meaning that the two vessels would pass port-to-port. White reportedly told Selinidis that he had been "running slow" but would "hook it up" and get past the DUVAL before Selinidis reached that point. Selinidis testified that he "pleaded" with White not to speed up but to go slow until the EAGLE cleared the DUVAL. Selinidis testified that he told White that the EAGLE was on "dead slow" speed and could not go any slower, and he asked White to let the EAGLE clear the DUVAL. Selinidis feared that if White tried to clear the DUVAL, the wheel wash from the tugs, pushing perpendicular on the DUVAL, would push the VICKIE in front of the EAGLE.

White testified that the VICKIE passed the BERYL, the first ship in the convoy without incident at the coke dock. White explained that before he reached the coke dock, he could see the EAGLE "way down the channel." He then passed two other inbound tugs. According to White, after he passed the BERYL, he began trying to raise the EAGLE on the radio but he received no response. White was traveling at between seven and eight miles per hour and slowed down as he was coming to Vessel Repair. White testified that when the VICKIE was at Vessel Repair, he spoke with the pilot of the EAGLE, who told him that the EAGLE was "running slow." According to White, they agreed

4

that the VICKIE would speed up to pass the DUVAL at the R&R and that they would pass each other on one whistle. White testified that Selinidis did not ask him to stop or slow down.

White increased his throttle to full and positioned the VICKIE as far to starboard as possible, towards the tugs that were pushing the DUVAL. As White passed the second tug, he met the EAGLE. The vessels were then abeam of the DUVAL at the R&R. White testified that his vessel stayed on his side of the channel and did not cross the centerline but that the EAGLE was on White's side of the channel. White passed the EAGLE without hitting it.

Selinidis testified that the VICKIE was over the centerline of the channel, and he had to take evasive action by forcing the ship to starboard so that the VICKIE could pass on his port side and avoid a collision. The EAGLE then experienced a sheer to port. Selinidis increased to full, tried to put the engines full astern, made a hard starboard rudder at the last minute and then ordered the anchors dropped. Selinidis's efforts were unsuccessful, and the allision occurred with the Vessel Repair drydock on the EAGLE's port side.

II. **Standard of Review**

We review legal conclusions and mixed questions of law and fact following a bench trial de novo. Phillips Petroleum Co. v. Best Offshore Servs., 48 F.3d 913, 915 (5th Cir. 1995). "In an admiralty action tried by a court without a jury, the factual findings of the District Court are binding unless clearly erroneous. Questions concerning the existence of negligence and causation are treated as factual issues subject to the clearly erroneous standard." Avondale Indus. v. Int'l Marine Carriers, Inc., 15 F.3d 489, 492 (5th Cir. 1994). Moreover, in a bench tried case findings regarding proximate cause are also subject to the clearly erroneous standard. Gavagan v. United States, 955 F.2d 1016,

5

1019 (5th Cir. 1992) (reviewing a district court's findings of contributory negligence in a bench tried admiralty case). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court based on all of the evidence is left with the definite and firm conviction that a mistake has been committed." Walker v. Braus, 995 F.2d 77, 80 (5th Cir. 1993) (reviewing a district court's determination of liability in a maritime action). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

III.   **Analysis**

The issues on appeal are 1) whether the trial court clearly erred by failing to make a specific finding of proximate cause, and 2) whether the trial court's finding of negligence by the VICKIE resulted from an incorrect view of the navigational rules and a clear error in applying the navigational rules. A thorough review of the record and the highly deferential review afforded bench trials of admiralty actions leads this Court to affirm the trial court's findings and conclusions. The following findings of the trial court are pertinent to the issues on appeal.

A.  Finding of Proximate Cause

We are persuaded that the trial court made sufficient findings to give this Court "a clear understanding of the factual basis for the decision." Burma Navigation Corp. v. Reliant Seahorse MV, 99 F.3d 652, 657 (5th Cir. 1996). The trial court defined the duties of each vessel, specifically

6

explained where each party breached those duties, made findings of negligence, and apportioned liability. Although the trial court made no separate finding of proximate cause, it is implicit in the trial court's negligence findings and apportioning of liability. See McLennan v. American Eurocopter Corp., Inc., 245 F.3d 403, 433 n.28 (5th Cir. 2001) (noting that although the district court entered no actual finding of proximate cause concerning a negligence claim, such a finding was implicit in the court's decision); see also, Brooks v. United States, 757 F.2d 734, 737 (5th Cir. 1985) (explaining that a district court's finding of facts in a bench trial must be specific enough to give appellate courts a clear understanding of the basis for the decision and to ensure that the district court has taken care in ascertaining the facts). In addition, Luhr conceded during oral arguments that it may be a fair inference from the trial court's findings that the VICKIE bore part of the responsibility for the vessels meeting in front of the R&R at the same time. The trial court did not clearly err in its view of the evidence and we deduce proximate cause.

The failure of proper communication formed the basis of the negligence finding against the VICKIE. The trial court concluded that both Selinidis and White were aware of the shortcomings in the channel, but it assigned most of the responsibility for the accident to Selinidis, captain of the EAGLE. In apportioning fault, the trial court made the following findings of mixed law and fact. The channel narrows in the vicinity of R&R because of significant shoaling over the years. Selinidis had actual knowledge of the shoaling and other immediate hazards in the vicinity. As a result, Selinidis kept the EAGLE on the centerline. The trial court determined that although the EAGLE was loaded with the most restrictive draft, Crystal cannot claim a superior position in the channel by assuming the risk of loading the vessel to that level. The EAGLE had no greater right to traverse the channel

7

than any other vessel. The trial court explained that had the EAGLE been loaded to a more shallow draft, it would have had greater mobility in the channel.

When the EAGLE and the VICKIE first made radio contact, the VICKIE was past the coke dock. When the EAGLE told the VICKIE, it was traveling "slow" it was actually traveling at 9.1 knots (more than half speed). At that time, the VICKIE was traveling slower, at approximately 4 knots. The EAGLE and the VICKIE agreed on a port-to-port pass. The trial court concluded that the EAGLE proceeded upchannel at full speed without tugs and did not reduce its speed until it passed beacon 54. The EAGLE was to be met by the tugs, HERMES and SPARTAN before reaching beacon 54 but the tugs were delayed with problems in docking the DUVAL. Given these conditions, the trial court found that the EAGLE should have reduced speed before beacon 54.

Even though the EAGLE inaccurately described its speed, other vessels are required to rely on independent observations of facts. Independent of the mis-communication between White and Selinidis, White testified that around North 40, before he reached the coke dock, he could see the BERYL. White further stated that "way down the canal I could see him [the EAGLE]. Way down the ship channel, is in that area I could see what appeared to be a ship down there. And I was trying to call the second [the EAGLE] – I knew they was there. The first pilot [of the BERYL] told me they was there." White further testified that as he was approaching Vessel Repair, he slowed down to approximately five miles per hour to accommodate some barges but still was unable to make contact with Selinidis. At this point, White could see the second ship in the channel. White explained that it was not until he spoke with Selinidis that he decided to "hook it up."

The trial court implicitly found that the VICKIE's failure to maintain proper communication and to observe relative speeds was the negligent conduct that in part caused the allision. The trial court

8

found that both Selinidis and White knew they had a duty, discussed infra, to rely on independent observations even if the information relayed to each other was accurate. The trial court found that independent of the communication between them, both Selinidis and White knew that they would encounter traffic and docking facilities in the channel. Rather than rely on their independent observations, the trial court found that Selinidis and White both relied on their communication. The trial court further found that the accident would not have occurred had the two vessels not met where they did. Luhr contends that it was the EAGLE's misinformation that caused the VICKIE to "hook it up," otherwise, the two vessels would not have met at the R&R. The trial court explained the duty of each captain to rely on their independent observations regardless of their communication. In its oral argument, Luhr confirmed that at the time the EAGLE described its speed, the VICKIE could see the EAGLE. The trial court explained the VICKIE's duty, found that the VICKIE failed to adhere to that duty, and then apportioned liability. From these findings, this Court can deduce a finding of proximate cause.

The trial court further noted that the east side of the channel was not obstructed by the DUVAL, the two tugboats, R&R, or any other structure. The trial court speculated that had the EAGLE and VICKIE chosen a starboard to starboard pass, there would have been ample room for all vessels, even at the narrowest point near the R&R facility. Moreover, if the EAGLE had actually been proceeding at 5.2 knots (i.e., "slow") when it passed beacon 56, and if the VICKIE did not speed up, the two vessels would not have met abeam of the R&R facility. Finally, if the EAGLE had an actual ground speed of 3.9 knots (i.e., dead slow) before reaching the R&R, the allision might have been avoided entirely. Thus, the trial court concluded that it was the failure of all vessels to establish prompt communication that foreclosed this opportunity.

9

Luhr argues that the trial court failed to make a specific finding that any negligence assigned to the VICKIE was a proximate cause of the allision, "i.e. that the VICKIE's actions caused the EAGLE to lose its steering." Specifically, Luhr contends that the trial court's findings that the bank suction would have been reduced and the allision probably would have been avoided if the EAGLE were going slower, and that the EAGLE began corrective maneuvers merely imply that a shear occurred rather than account for proximate cause. Moreover, Luhr asserts that the trial court's finding that the EAGLE traveled near the centerline at all times with sixty to seventy feet of the vessel across the centerline negates any relationship with the EAGLE's meeting with the VICKIE. We disagree with Luhr's theory of the incident.

The trial court did not specifically mention the cause of the sheer, but from Selinidis's testimony the trial court noted that the EAGLE's hard starboard move and the resulting sheer most likely occurred as a result of the EAGLE's maneuver to avoid the approaching VICKIE. Selinidis testified that he took evasive action to avoid a collision with the VICKIE and to allow it to pass on his port side. A fair reading of the trial court's decision is that the failures of both the VICKIE and the EAGLE constituted negligence and that together, their conduct was the proximate cause of the two vessels meeting at the R&R, resulting in the damage to the drydock. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). The trial court's view of the incident is not clearly erroneous.


B.  Application of the Navigational Rules


10

White and Selinidis had a duty to discover hazards quickly and to promptly respond to such hazards to avoid a collision. The Inland, Western Rivers and Great Lakes Rules 33 U.S.C. §2001 et seq ("the Inland Rules") prescribe in detail the applicable course of conduct. Rule 9 of the Inland Rules prescribes a course of conduct in narrow waterways to avoid collision. Rule 7 proscribes conduct to determine whether a risk exists. Rule 8 prescribes actions to avoid a collision. Rule 6 prescribes conduct to determine a safe speed to avoid collision. Where there is no applicable standard of statutory conduct, all mariners have a duty to act as a reasonably prudent mariner. Luhr contends that the trial court erroneously applied the Inland Rules.

Relying on the Inland Rules, the trial court found both vessels negligent. Specifically, the trial court concluded that the EAGLE was in clear violation of Rule 9(a)(i) because it was sixty to seventy feet "across the centerline of the channel." See 33 U.S.C. § 2009(a)(i). The trial court also found the EAGLE in violation of Rule 7, because it did not make a full and accurate appraisal of the situation presented by the docking of the DUVAL and the consequent risk of collision. See 33 U.S.C. § 2007. Finally, the trial court found the EAGLE in violation of Rule 6, 33 U.S.C. § 2006 because Selinidis had sufficient knowledge to reduce its speed much earlier.

The trial court concluded that both the VICKIE and the EAGLE were at fault because each vessel had a general duty to proceed in a safe manner. see also 33 U.S.C. § 2002 ("Rule 2").[2] The trial court concluded that the EAGLE and the VICKIE both failed to maintain proper communication, both vessels had a duty to rely on the conditions as observed, and both vessels failed to notice the relative closing speed and distance between each other and to take appropriate actions, in violation of Rules

---

[2]Although the trial court did not explicitly rely on Rule 2, it prescribes a general duty of care "by the ordinary practice of seaman, or by the special circumstances of the case," even if it means departing from the Inland Rules when necessary to avoid immediate danger. 33 U.S.C. § 2002.

11

7 and 8 of the Inland Rules. Based on its findings of duty and the breach of those duties, the trial court assigned sixty-seven percent of liability to the EAGLE, owned by Crystal, and thirty-three percent of liability to the VICKIE, owned by Luhr.

Luhr argues that the judge's determination of negligence by the VICKIE resulted from an incorrect view of the navigational rules. Luhr complains that the trial court made four references to the VICKIE's conduct and characterized three of them as "failures" but none as "negligence."[3] First, Luhr disputes the judge's finding that the two vessels could have set up for a two whistle, starboard side passing. According to Luhr, neither Selinidis nor White testified that such a passing was contemplated and that the VICKIE successfully executed one whistle, port side passings with two other tugs before meeting the EAGLE. Second, Luhr disputes the judge's finding that if the VICKIE had not increased its speed, the vessels would not have met at the R&R. Luhr argues that the VICKIE never came into contact with anything that morning and that the meeting at the R&R was not problematic. Rather, Luhr asserts that the EAGLE failed to properly advise the VICKIE of the EAGLE's speed. This Court reviews mixed questions of law and fact and reverses if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts. Bose Corp. v. Consumers Union of the U.S., Inc., 446 US 485, 501 (1984); Phillips Petroleum Co., 48 F.3d at 915.

If a vessel's negligence is in violation of a statutory duty, the Pennsylvania Rule shifts the burden to the offending vessel to prove that its conduct did not and could not have caused the allision. The

---

[3]The trial court found the following three failures on the part of the VICKIE: 1) "The VICKIE failed to establish and maintain proper communication with the VICKIE"; 2) "Both vessels failed to notice the relative closing speed and distance between each other and take appropriate actions in violation of 33 U.S.C. §§ 2007(a) and 2008"; and, 3) "[T]he relative speed of the vessels, the shape of the channel, and the earlier passage of the BERYL presented the opportunity for the VICKIE to swing wide at the North 40 and set up for a two-whistle pass to starboard. It was the failure of all vessels to establish prompt communication that foreclosed this opportunity."

12

Pennsylvania, 86 U.S. 125 (1874); see Marine Transport Lines, Inc. v. M/V Tako Invader, 37 F.3d 1138, 1142 (5th Cir. 1994) ("When both parties to a collision have violated statutory regulations designed to prevent collisions, the trier of fact apportions fault between the vessels unless either vessel proves that its fault was not a substantial contributing cause of the collision."). Neither the EAGLE nor the VICKIE has met this burden.

The trial court found the EAGLE in violation of Rules 6, 7, 8, and 9, and the VICKIE in violation of Rules 7 and 8. Luhr contends that the district court incorrectly applied Rule 8 because the meeting was governed by the Narrow Channel Rule, Rule 9. In other words, Luhr asserts that Rules 8 and 9 cannot be simultaneously applicable. We disagree. Although the case law on negligence in violation of all three Rules is sparse, Courts have found vessels in violation of Rule 9, as well as other Inland Rules, including Rules 7 and 8. See Marine Transport Lines, Inc., 37 F.3d at 1138; Western Pacific Fisheries, Inc. v. SS President Grant, 730 F.2d 1280 (9th Cir. 1984).

In Marine Transport Lines, Inc., Marine Transport brought an admiralty claim against Tako Towing asserting that Tako's negligence was in violation of the Inland Rules. 37 F.3d at 1140. The district court found Tako in violation of Rules 7, 8, 9, and 14 and found Marine Transport in violation of Rules 7, 8, 14, and 34. The district court apportioned seventy-five percent of the fault to Tako and twenty-five percent of the fault to Marine Transport. Id. Tako appealed alleging, *inter alia*, that the district court misapplied the Inland Rules and incorrectly apportioned fault. Id. at 1142. In particular, Tako Transport alleged that the district court misapplied Rule 9 because the waterway was 1200 feet wide. Although this Court remanded to determine whether the waterway qualified under Rule 9, the Court held "that a vessel descending the Mississippi River must adhere to the

13

default requirements of Rules 9 and 14." Id. at 1145. Similarly, the trial court can determine whether the vessels were negligent in violation of Rules 7, 8, and 9.

Luhr further argues that the VICKIE was not in violation of Rules 7 and 8. The trial court determined that the VICKIE and the EAGLE violated Rule 7 because "[b]oth vessels failed to notice the relative speed and distance between each other," and Rule 8 because both "failed to take appropriate actions." Luhr asserts that the trial court erred because Rule 7 governs collisions between vessels and no collision between the vessels occurred. Although it is true there are only a few cases that have applied the Inland Rules to allisions, this does not foreclose the application of Rules 7 and 8 in such cases. See e.g., Canal Barge Co., Inc. v. China Ocean Shipping Co., 770 F.2d 1357, 1362 (5th Cir. 1985) (considering Rule 9 in an allision case); Complaint of Magnolia Towing Co., Inc., 764 F.2d 1134 (5th Cir. 1985) (apportioning fault in an allision case based on violations of Rule 6); Cliffs-Neddrill Turkey Int'l-Oranjestad v. M/T Rich Duke, 947 F.2d 83, 90 (3d Cir. 1991) (finding two vessels in violation of Rule 7 in an allision case). The trial court understood the law.

In the alternative, Luhr contends that the trial court erroneously applied the facts to the Inland Rules. The trial court found that all vessels have a general duty to proceed in a safe manner and must also rely on conditions as observed. see also 33 U.S.C. § 2002 ("Rule 2"). Applying this rule, the trial court found that the inaccurate speed information provided by the EAGLE did not exonerate the VICKIE for failing to notice the closing speed and distance of the EAGLE. As is the province of trial courts, the magistrate judge weighed the evidence presented and applied the facts to the rules. The captain of the BERYL testified that when he passed the VICKIE at the coke dock, he suggested to White to slow down because the channel was going to be narrow. White testified that it was too late to stop. There was conflicting testimony as to which vessel attempted to raise the other by radio and

14

received no response. The trial court placed responsibility on both vessels for failing to establish communication. The trial court's finding that the VICKIE failed to maintain proper communication with the EAGLE supports a finding of negligence. This finding was not clearly erroneous.

IV.    **Conclusion**

After a careful review of the record, we have no "definite and firm conviction" that the trial court has made a mistake. Walker v. Braus, 995 F.2d at 80. A fair reading of the trial court's findings of the applicable duties, the breach of those duties, and the apportionment of liability yields an inference of proximate cause. Moreover, the trial court correctly interpreted and applied the Navigational Rules to this case. For these reasons, we AFFIRM the ruling below.

AFFIRM.